In re LAWRENCE et al.

(Circuit Court of Appeals, Second Circuit. December 15, 1908.)

No. 72.

**1.** CONTRACTS (§ 128*) — VALIDITY — ILLEGALITY OF CONSIDERATION — "COMPOUNDING OF FELONY."

Under Pen. Code N. Y. § 125, which provides that a crime is compounded when a person takes money or other property or a promise therefor on an agreement, express or implied, to abstain from a prosecution therefor, notes given by an employé to a corporation for money embezzled by him, and signed by an indorser upon an understanding with officers of the corporation that if such notes and security were given the employé would not be prosecuted, were given in part for an illegal consideration, and, as against the indorser, are void.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 633–653; Dec. Dig. § 128.*

For other definitions, see Words and Phrases, vol. 2, p. 1373.]

**2.** BILLS AND NOTES (§ 239*) — INDORSEMENT — VALIDITY — CONCEALMENT OF FACTS BY PAYEE.

A bankrupt had been induced to become an accommodation indorser on notes to a corporation for a large amount, in reliance on the solvency of a prior indorser, who was apparently financially responsible. The corporation had a few days before taken a mortgage on practically all of the property of the first indorser, and in fact he was insolvent. The bankrupt did not know of such mortgage, and the corporation not only did not inform him of the fact, but when he sought to withdraw his name from the notes before their delivery he was told by its attorney that they regarded the first indorser as good. *Held,* that it was the duty of the payee under the circumstances to disclose the facts, and that its failure to do so avoided the bankrupt's indorsement.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 570; Dec. Dig. § 239.*]

**3.** BILLS AND NOTES (§ 113*)—VALIDITY—WAIVER OF DEFENSE.

An agreement by an indorser of notes waiving any defense to such notes or renewals thereof does not estop him from setting up the defense that they were given for an illegal consideration.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 223, 224; Dec. Dig. § 113.*]

Appeal from the District Court of the United States for the Southern District of New York.

The following is the report of Thayer, Referee:

This claim is made upon two promissory notes which are in the following form:

"$10,000. Yonkers, N. Y., Jan. 14, 1901.

"Seven months after date I promise to pay to the order of myself ten thousand 00/100 dollars, at the Westchester Trust Company, in the city of Yonkers, with interest.

"Value received. No. ———. Due Aug. 14. L. R. Dickson."

Indorsed: "L. R. Dickson. Andrew Deyo. E. Russell Coles. N. Lawrence. ($2 revenue stamp duly canceled.)"

"$14,000. Dobbs Ferry, N. Y., Jan. 11, 1901.

"Two months after date I promise to pay to the order of myself fourteen thousand 00/100 dollars, at the Westchester Trust Company, Yonkers, N. Y., with interest.

"Value received. Due Aug. 12. L. R. Dickson."

Indorsed: "L. R. Dickson. Nathaniel Lawrence. Andrew Deyo. E. Russell Coles. ($2.80 revenue stamps duly canceled.)"

These notes were renewals. The originals were dated July 9, 1900, and were for $10,000 and $25,000, respectively, $1,000 having been paid upon the larger note.

The testimony is that the original notes were indorsed by Dickson and by Andrew Deyo, Nathaniel Lawrence, and E. Russell Coles, in the order named. (Minutes March 4, 1902, pp. 259, 260.)

The claim is contested by the trustee upon three grounds: First, that the original notes were affected by an illegal consideration, namely, the compounding of a felony, and were therefore void; second, that Nathaniel Lawrence, one of the bankrupts, indorsed the notes, relying upon the supposed responsibility of Andrew Deyo, a prior indorser, and that the Westchester Trust Company, the original recipient of the notes, concealed from him the fact that Deyo was heavily indebted to it, and that it had taken from him a mortgage for $50,000, covering all his available property; and, third, that the said trust company held security which was available as collateral to these notes, which has not been accounted for.

The claimant denies all of these allegations, and claims to be a bona fide holder of the notes in due course. He also claims that Nathaniel Lawrence and his trustee in bankruptcy are estopped from questioning the notes by reason of written agreements which were executed by him, in which he declared that the notes were valid and free from defenses.

In order to determine the questions thus presented, it is necessary to examine the origin and history of the notes in question. The Westchester Trust Company was a corporation duly organized under the laws of the state of New York, and carrying on business in the city of Yonkers, Westchester county, for some time prior to June 30, 1890. Leslie R. Dickson, one of its employés, had occupied the position of cashier and performed the duties of receiving and paying teller. (Minutes Nov. 28, 1906, p. 5; Jan. 2, 1907, p. 25.) On the last-mentioned day the executive committee of the company examined its affairs and found no irregularity. (Minutes Jan. 2, 1907, p. 25.). This was on Saturday. On Sunday, July 1st (same minutes, p. 24), Dickson went to John Hoag, the president of the company, and made a statement to him, in consequence of which Mr. Hoag reported to the executive committee that "there was a shortage in the accounts of the cashier, in which Mr. Deyo, perhaps, was more or less interested." (Minutes Nov. 28, 1906, pp. 5, 6; Jan. 2, 1907, p. 34; and Jan. 15, 1907, p. 75.) It appears in the course of the testimony that the amount of the shortage, as far as Dickson was concerned, was about $35,000 (Minutes Feb. 6, 1902, p. 250; Nov. 28, 1906, pp. 4, 18; and Jan. 15, 1907, p. 74), and that the amount for which Deyo was involved was about $46,000. (Minutes Jan. 2, 1907, pp. 3, 5, 28.) On Monday, July 2d, Mr. Daniel S. Remsen, who was a member of the board of directors and of the executive committee (Minutes of Jan. 22, 1907, pp. 101, 102), and also the attorney for the company, was summoned by telegraph from Lake George, and reached Yonkers July 3d (same minutes, p. 103). The Dickson and Deyo matters were referred to him. (Minutes Jan. 15, 1907, p. 71). On the same day Mr. Remsen prepared a mortgage to Frank H. Parsons, his law partner, for $50,000, covering practically all of Deyo's available property. This was executed by Deyo and his wife, and was recorded July 7th. (Minutes Nov. 28, 1906, p. 19; Jan. 2, 1907, pp. 12, 18; Jan. 22, pp. 12, 104, 106, 107.) Deyo had been a customer of the company from the time of its organization. He did business under the name of P. A. Deyo & Son. (Minutes Jan. 22, 1907, p. 88.) The consideration for the mortgage above mentioned was his indebtedness to the company. (Minutes Jan. 2, 1907, pp. 16, 17.) The amount of such indebtedness on the 30th of June, 1900, as far as it appeared on the books of the company, was $6,750. (Minutes Jan. 2, 1907, p. 19; Jan. 22, 1907, pp. 80, 81.) The 4th of July was a holiday. On July 5th a meeting of the executive committee of the company was held at the office of some one who is designated as General Thomas, at which Dickson was present and made a statement of his transactions. (Minutes Nov. 28, 1906, p. 9; Jan. 2, 1907, p. 9; June 22, 1907, p. 106.) Mr. Remsen was present. After the meeting he and Mr. Hoag accompanied Dickson to the office of the American Surety Company, and Dickson made a statement to Mr. Halliday, of that company. The surety company was on Dickson's

bond to the Westchester Trust Company, for $10,000. When Mr. Remsen left the office of the surety company, Dickson was still there. (Minutes Jan. 22, 1907, p. 109.) On Sunday afternoon, July 8th, Andrew Deyo called on Nathaniel Lawrence in reference to obtaining his indorsement on certain notes for Dickson. Mr Lawrence refused to give the indorsement. Dickson, accompanied by another gentleman, had previously four or five days before called on Lawrence at his store in Dobbs Ferry and made a similar request, which Lawrence had at that time refused. (Minutes of Jan. 2, 1907, pp. 31, 32.) On this Sunday, July 8th, Deyo asked Lawrence to go to Mr. Remsen's house with him "to talk over Dickson's defalcation of the trust company's money," saying, that if Dickson didn't get those notes signed by Monday morning, he would have to go to jail. (Same minutes, p. 34.) Lawrence went with Deyo to Mr. Remsen, whom he knew to be the counsel for the trust company, and talked the matter over. Mr. Lawrence says that Mr. Remsen told him that the notes must be signed by the next morning or Dickson would have to go to jail. (Same minutes, p. 35.) On cross-examination, he modifies that statement thus: "Mr. Deyo and Mr. Remsen were talking; it was said there that, if he did not have the notes signed the next morning, Dickson would have to go to jail." (Same minutes, p. 41.) Mr. Remsen denies using this language, and states that what he did say was that, if they wanted him to present those notes to the trust company, they had better have them there the next morning, as there was to be a meeting of the board or executive committee the next day, at which he would present them. (Minutes of Jan. 22, 1907, pp. 95, 96.) The following morning, July 9th, Deyo called on Lawrence with the notes signed by Dickson and indorsed by Deyo. Lawrence then indorsed them. (Minutes Jan. 2, 1907, p. 35.) They were delivered the same day by Deyo to Mr. Remsen. (Minutes Jan. 22, 1907, p. 97.) No one informed Lawrence that Deyo was involved in Dickson's defalcation, or that Deyo had mortgaged his property to the trust company, and he had no knowledge of these things at the time. (Minutes Nov. 28, 1906, pp. 8, 9; Jan. 2, 1907, pp. 22, 36, 37, 112; Jan. 22, 1907, pp. 111 114.) He knew Deyo in a general way, both being in somewhat similar lines of business. Mr. Lawrence's indorsement was purely for accommodation. (Minutes Jan. 2, 1907, pp. 31, 32.) On the next day, July 10th, Lawrence called on Mr. Remsen at his office in New York, and stated that he wanted his name taken off of those notes. Mr. Remsen told him that Mr. Sheehan "had that in charge." He went with Mr. Remsen to Mr. Sheehan's office, and, as he testifies, "Mr. Hoag and Mr. Sheehan were there, and I demanded that my name be taken off; and he said, 'What are you going to do with the boy—let him go to jail?'" (Same minutes, p. 38.) Mr. Hoag denies that the language quoted was used in his presence. He cannot, however, remember clearly anything that was said at the meeting in question. (Minutes Jan. 22, 1907, p. 91.) Mr. Remsen is quite positive that no such thing was said (Same Minutes, p. 93), but he corroborates Mr. Lawrence's testimony that he requested to have his name taken off the notes. (Same Minutes, p. 113.) Mr. Lawrence also testified that Mr. Sheehan said, at the same interview, "that they had gone over Mr. Deyo's affairs and thought him good." (Minutes Jan. 2, pp. 39, 43.) Mr. Hoag and Mr. Remsen both say that no such statement was made that they can remember. (Minutes Jan. 22, pp. 86, 87, 94.) Mr. Hoag says that he was not present during the whole of the interview between Sheehan and Lawrence, and cannot remember clearly what conversation was had. (Minutes Jan. 22, 1907, p. 91.) Whatever was said, the result was that Mr. Lawrence did not insist upon his request. The notes were offered to the company and were accepted, and Dickson returned for a time to his place with it. (Minutes Jan. 22, 1907, p. 119.) E. Russell Coles, the last indorser on the notes, was a bookkeeper for Deyo. (Minutes Feb. 6, 1902, pp. 255, 256.) Three notes were at that time made out in the manner above mentioned, and delivered to the Westchester Trust Company. The American Surety Company paid the amount of its liability ($10,000) on Dickson's bond, and one of the notes, which was made for that amount, was transferred to it. This note was subsequently paid by Nathaniel Lawrence. (Minutes Nov. 28, 1906, pp. 11, 24 25; Jan. 2, 1907, pp. 39, 48). The other two notes, one for $10,000 and one for $15,000, afterwards reduced by Nathaniel Lawrence to $14,000, were re-

tained by the trust company. The note for $10,000 was sold by the trust company before maturity to the Mercantile National Bank of New York. The note for $15,000 was sold by the trust company before maturity to the Leather Manufacturers' National Bank of New York, and these notes or renewals of them appear to have remained in possession of these banks until they were overdue and protested for nonpayment (Minutes March 4, 1902, p. 287, et seq.). They were then taken up by the Westchester Trust Company, and the amounts due on them were paid by it to the respective banks which held them. At the time when they were so taken up, an agreement in writing was signed by Deyo, Coles, and Lawrence, with reference to each note, to the effect that they had requested the Westchester Trust Company to take up these notes, and in consideration thereof waived any and all defenses that they might have to the notes or the renewals thereof. The agreement in reference to the $14,000 note was dated September 12, 1901, and that note was taken up by the trust company September 17, 1901. The agreement in reference to the $10,000 note was dated January 23, 1901, and it was taken up by the trust company February 1, 1901. (Minutes March 4, 1902, p. 281, et seq.) At about the same time both notes were transferred to Abram Sebring, the present claimant, for a consideration of one dollar. (Minutes March 4, 1902, p. 280.)

These are the most material facts disclosed by the evidence. The hearings extended over a long period of time, having been commenced in February, 1902, and not concluded until January, 1907. The evidence, therefore, was presented in a somewhat disconnected manner, and it was not easy at times for the referee to see the bearing of evidence offered or to keep in mind its connection with other evidence in the case. From a careful examination and review of all the testimony, I think the foregoing is a correct and just statement of the facts proved.

The first question to be considered is whether the consideration for these notes, or a part of that consideration, was the compounding of a felony. There is no doubt that a felony was committed. Dickson was an embezzler of the trust company's funds to the amount of about $35,000. He gave these notes to cover a part of that amount, and he was not prosecuted as far as appears. (Minutes Jan. 2, 1907, p. 13.)

Under the New York Penal Code, § 125, a crime is compounded when a "person * * * takes money or other property, gratuity, or reward, or an engagement or promise therefor upon an agreement, express or implied to compound or conceal a crime, or a violation of a statute, or to abstain from, discontinue, or delay a prosecution therefor, or to withhold any evidence thereof, except in a case where a compromise is allowed by law." The essence of the offense is the agreement. The bare retaking of one's own goods which have been stolen, or the receiving back of embezzled funds, or the acceptance of security for their future repayment, is not unlawful unless there be some agreement, express or implied, to shield the thief. The fact that the owner after the return of the property or the taking of the security, voluntarily abstains from prosecuting, while it may make him guilty of a misprision, cannot constitute a compounding. If the agreement is made, it is immaterial whether the criminal is afterward prosecuted or not. See 6 Am. & Eng. Encyc. of Law (2d Ed.) p. 401, and cases cited. An agreement not to prosecute avoids the whole transaction. Buffalo Press Club v. Greene, 86 Hun, 20, 33 N. Y. Supp. 286. The question of an agreement is one of fact. Kissock v. House, 23 Hun, 35. An agreement, however, may be inferred from the circumstances of the case. Conderman v. Hicks, 3 Lans. 108.

In the present case there is no evidence of an express agreement not to prosecute, but it is urged in behalf of the trustee that an implied agreement appears clearly from the evidence. Upon this point the testimony of Mr. Hoag, the president of the company, is suggestive: "Q. Mr. Hoag, you have stated that there was no agreement not to prosecute Mr. Dickson. Do you make a distinction in your mind between agreement and understanding? In other words, was there any understanding at the time of the taking of these notes in relation to your conduct toward Mr. Dickson? (Objected to. Objection overruled. Exception.) A. I must ask what you mean by an understanding. Q. I ask you, Mr. Hoag, whether you make any distinction in

your mind between an agreement and an understanding, when you say there was no agreement? Do you make such a distinction? A. I can only repeat that there was no agreement." (Minutes March 4, 1902, pp. 274, 275.) Some arrangement had been made between the company and Dickson by which he was to take care of the amount which he owed, by giving notes, and Mr. Hoag, the president, had a conversation with the counsel for the company a day or two before the notes were delivered. (Minutes Nov. 28, 1906, p. 15; Feb. 6, 1902, pp. 250, 251, 252, 253.) It was Dickson who first asked Lawrence to indorse the notes. That was four or five days before they were indorsed, and at that time "a gentleman" came with him. (Minutes Jan. 2, 1907, p. 31.) Afterwards Deyo called on Lawrence and made the same request. (Page 32.) He called twice—the last time, on Sunday afternoon, the time when he asked Lawrence to go with him to Mr. Remsen's to talk over the matter of Dickson's defalcation. At that time he said that if Dickson did not have those notes signed by Monday morning he would have to go to jail. (Same minutes, pp. 33, 34.) This statement of Deyo's at that time is not evidence against the company, in the absence of proof that it was authorized or adopted by them. Mr. Lawrence, however, swears that, when he accompanied Deyo to Mr. Remsen's the same afternoon, Mr. Remsen told him the same thing in almost the same words, or that it was said in the conversation between Remsen and Deyo. (Minutes, Jan. 2, 1907, pp. 35, 41.) I think that Mr. Lawrence's testimony in regard to these statements is true. It is clear and positive, and has the sound of truthfulness. There was every reason why what passed at those interviews should be impressed upon his mind. Mr. Remsen confirms a part of his testimony, that he said that those notes should be presented by the following morning, though he denies the other part. I think Mr. Lawrence's recollection is the better, and that the other statement was made either by Mr. Remsen or in his presence, and was not disavowed by him. I am also inclined to credit Mr. Lawrence's testimony as to what took place at Mr. Sheehan's office, as he is equally clear and positive about that, and neither Mr. Remsen nor Mr. Hoag is able to say with certainty that Mr. Sheehan did not say what Mr. Lawrence testifies that he did. There is some evidence that Dickson was in custody of the surety company while negotiations about the notes were in progress. Mr. Hoag took him there after his confession and left him there. When Dickson called on Mr. Lawrence, "a gentleman" was with him. It was not until after the notes had been accepted that he reappeared in his accustomed place. (Minutes Jan. 2, 1907, p. 10; Jan. 22, 1907, p. 109.)

I think there can be no doubt that the consideration which moved Mr. Lawrence to indorse the notes was his friendship for Dickson and desire to save him from criminal prosecution; and it is a fair deduction from all the evidence that there was a very distinct understanding that unless Dickson furnished security satisfactory to the trust company he would be prosecuted criminally, and, conversely, that if he furnished such security he would not be prosecuted. It was perfectly proper for the trust company to seek to recover their money and to use all lawful means for obtaining security for it, but, if they agreed in consideration of such security not to prosecute the defaulter, they went too far; and that Mr. Lawrence's indorsement was obtained upon such an agreement, clearly implied, I cannot doubt. It seems to follow that the consideration for the notes was in part illegal. That vitiates the transaction. Haynes v. Rudd, 102 N. Y. 372, 7 N. E. 287, 55 Am. Rep. 815.

It may be noted that the circumstantial evidence of an agreement or understanding that Dickson would not be prosecuted is not met by any explicit denial. It is urged in behalf of the claimant that, even if this were so, the parties on either side were in pari delicto, citing Haynes v. Rudd and other cases. I am unable to see how this argument aids the claimant. The cases cited hold that, where parties to such a transaction are in pari delicto, the court will leave them where it finds them. If that principle is to be applied in this case, apparently it leaves the claimant with the notes on his hands. If Lawrence had paid the notes and were seeking to recover back the money, the argument might be good.

The second point made by the trustee is that Lawrence's indorsement was obtained by the concealment or misrepresentation of material facts which were in the possession of the trust company as to the responsibility of Deyo, the prior indorser. The company, no doubt, knew that Lawrence relied upon the responsibility of Deyo, as he had a right to do. See 1 Am. & Eng. Encyc. of Law, p. 357; MacDonald v. Magruder, 3 Pet. 470, 7 L. Ed. 744. The fact that Deyo afterwards was found to be insolvent and was adjudicated bankrupt March 16, 1901, some eight months after the making of these notes, does not prove that he was not solvent when the notes were made; but it does appear that when the notes were made he had just mortgaged all of his available property to the trust company for $50,000, under circumstances which were certainly peculiar, and this certainly affected his capacity for assuming a further obligation of $35,000. Moreover, it is impossible, upon consideration of all the evidence, to resist the conclusion that Deyo was associated with Dickson in defrauding the trust company. The officers of the company are naturally reluctant to speak of it, but they do not deny the fact, and practically admit it again and again in the course of their testimony. Both the Dickson matter and the Deyo matter were referred to their counsel. (Minutes Jan. 15, 1907, p. 7.) The first fruit of Dickson's disclosures to the president of the company was Deyo's mortgage for $50,000. It was executed within two days—just as soon as the attorney for the company could be summoned by telegraph and the papers could be prepared. It is conceded that this mortgage was made for the benefit of the trust company, yet it was not made to the company direct, but to Mr. Parsons, one of its attorneys. This is one circumstance which suggests that it was not an ordinary business transaction. The president of the company will not deny that the mortgage was obtained from Deyo by threat of prosecution for obtaining money from the company improperly. (Minutes, Jan. 2, 1907, p. 18.) The apparent indebtedness of Deyo to the company, as shown by the books, was only about $6,750. It appears, also, that checks of Deyo had been carried in the teller's till as cash. (Minutes Jan. 2, 1907, pp. 5, 15, 28.) Why did Deyo indorse these notes for Dickson, thus assuming an obligation of $35,000 to the trust company immediately following one for $50,000 which he had just given? And why was he active in obtaining Lawrence's indorsement? It was he who persuaded Lawrence to indorse the notes, and it was he who delivered them to the attorney for the company. All of the circumstances point strongly to the conclusion that Deyo was a partner in Dickson's wrongdoing, and profited by it even more largely than Dickson did. Again, about two weeks after the transaction of the notes, a director of the trust company told Lawrence that Dickson was a defaulter for $35,000, and that Deyo, through him, had got $46,000 more. This testimony was objected to as hearsay, but it was a statement made by a director of the company to Lawrence, and it appears to me that it is evidence in reference to the nature of Deyo's connection with these transactions. It might be inferred that the trust company, in addition to obtaining security from Deyo, had required him also to aid in obtaining security from Dickson. However that may be, he did it. The company knew of his agency in the matter; it knew of his own dealings with it, and of its mortgage upon his property. It is not alleged that anything of Deyo's dealings with the company was communicated to Lawrence prior to his indorsement of the notes. He says that no one told him of these things, and that he did not know of them. It does not appear that the company requested Lawrence to indorse the notes before accepting them. (Minutes Nov. 28, 1906, pp. 26, 27.) Was it under any obligation to ascertain whether he knew the facts as to Deyo?

It is the general rule that when persons are dealing with each other at arm's length, and there is no actual relation of trust or confidence between them, neither is under any duty, in the absence of inquiry, to disclose facts which are equally within the means of knowledge of both; and, if one fails to do so. he is not guilty of fraud either for the purpose of an action of deceit, or for the purpose of rescission at law or in equity. Even when a fact is peculiarly within the knowledge or means of knowledge of one of the parties, he is under no duty to disclose it if he is dealing with the other party at arm's length, and the fact is not one as to which the other party

has a right to expect information. As to some facts, however, even when the parties are dealing at arm's length, one of them may have the right to rely upon the other's volunteering information, so as to raise a corresponding duty to disclose, and in such a case intentional silence will amount to fraud. As a general rule, it has been said each party is bound in every case to communicate to the other his knowledge of material facts, provided he knows the other to be ignorant of them, and they be not open and naked or equally within the reach of his observation. Am. & Eng. Encyc. of Law (2d Ed.) vol. 14, pp. 72, 73. It was held to be a fraudulent suppression avoiding the sale of commercial paper for the vendor to withhold information that the makers' check upon the bank in which they kept their account had been protested, though the vendor's informant accompanied his statement with the expression of his opinion that the makers were perfectly solvent. Brown v. Montgomery, 20 N. Y. 287, 75 Am. Dec. 404. Where a person taking a security knows certain facts, and is present, having an opportunity to inform the proposed surety thereof, and having reason to believe that the proposed surety does not know such facts and is being deceived and defrauded into becoming such surety, it is the duty of such person to inform the surety of such facts, and the acceptance by him of the surety under such circumstances, without enlightening him as to the facts, constitutes a fraud which will avoid the contract of suretyship. Farmers' National Bank v. Van Slyke, 49 Hun, 7, 1 N. Y. Supp. 508. In this case the court cite Daniel on Negotiable Instruments, § 1309, as follows: "The contract of suretyship is a contract uberrimæ fidei; therefore, where one is induced to become surety for another as drawer of a ·bill or indorser of another, for accommodation or otherwise, and there is any misrepresentation or fraudulent concealment of a material, fact, which if known would have induced the drawer or indorser or other surety not to enter into the contract, his contract is void from the beginning as between the surety and all parties privy to such misrepresentation or concealment." Where the holder of a note, knowing that the maker and indorser are insolvent, but without disclosing such information, sells the note to one who is ignorant of that fact, he is guilty of a fraud on the purchaser for which an action may be maintained. Boston National Bank v. Armour, etc., 53 Hun, 629, 6 N. Y. Supp. 714. In Rothmiller v. Stein, 143 N. Y. 582, 38 N. E. 720, 26 L. R. A. 148, the court says: "There are occasions upon which it becomes the legal duty of the individual to volunteer information unasked by another; occasions where a failure to state a fact is equivalent to a fraudulent concealment, and avoids a contract equally with an affirmative falsehood. * * * In regard to the necessity of giving information which has not been asked, the rule differs somewhat at law and in equity, and while the law courts would permit no recovery of damages against the vendor because of mere concealment of facts under certain circumstances, yet if the vendee refused to complete the contract because of the concealment of a material fact on the part of the other, equity would refuse to compel him to do so, because equity only compels the specific performance of a contract which is fair and open, and in regard to which all material matters known to each have been communicated to the other"—citing 1 Story, Equity Jurisprudence, § 206.

It would seem that, under the principles clearly laid down by the courts, it was the duty of the Westchester Trust Company, in accepting Mr. Lawrence's indorsement, to inform him of the facts as to Mr. Deyo's financial condition and dealings with the company, or to ascertain whether he knew such facts. But this is not quite all. Mr. Lawrence repented overnight of his indorsement, and endeavored to withdraw it, as he had a right to do before the notes had been accepted. 1 Am. & Eng. Encyc. Law (2d Ed.) p. 340, and cases cited. He was taken to Mr. Sheehan, as the representative of the trust company He says that Mr. Sheehan reassured him by saying that they had investigated Deyo and thought him all right. Mr. Hoag and Mr. Remsen were there, and they deny that this was said in their presence, but they do not profess to remember all that passed. I think that Mr. Lawrence is right. He went to New York for the express purpose of canceling his indorsement, and his memory of what passed is not likely to be at fault. Something induced him to withdraw his demand that his name be removed

from the notes, and no other explanation of his conduct than his own is offered. I think, therefore, that his indorsement was obtained not only by silence as to material facts, but by actual suppression of them. The result was that Mr. Lawrence was drawn into a very heavy liability in connection with a matter in which he has no personal interest, and it appears as a matter of fact that his name was the only responsible one on the paper. Dickson was worthless, Deyo was doubtful, and Coles does not appear to have been responsible. Mr. Lawrence was led to believe that Deyo at least was good. Deyo's action in drawing him into the matter was indefensible, and· the agents of the trust company did not in my opinion show that degree of consideration and good faith to which Mr. Lawrence was entitled. It is clear from the evidence that Mr. Lawrence would not have indorsed the notes if he had known the facts which were in the possession of the trust company.

The question now arises, what was the. effect of the agreements waiving defenses which Mr. Lawrence signed when the trust company took back the notes from the New York banks? If the consideration for the indorsement was illegal, I do not think that any waiver of such defense by Mr. Lawrence was effected. The nonenforcement of illegal contracts being a matter of public interest, a party thereto cannot by stipulation, either at the time of the execution of the contract or afterwards, waive his right to set up the defense of illegality in any action thereon by the other party. The same rule of public policy which forbids the execution of the contract forbids the giving of a quasi validity thereto by. the waiver of such defense. 15 Am. & Eng. Encyc. of Law (2d Ed.) p. 1014, and cases cited; Bridger v. Goldsmith, 143 N. Y. 424, 38 N. E. 458. Nor do I think that Mr. Lawrence or his trustee is debarred by the agreements in question from contesting the validity of his indorsement, upon the ground of misrepresentation and concealment of material facts. When the trust company took back the notes and took from the indorsers instruments purporting to waive any defenses thereto, they were not in the position of strangers unacquainted with the facts connected with the origin of the notes, and relying upon the statements made in the new agreements. They were as fully informed as Mr. Lawrence was, and perhaps more fully informed as to all the facts and circumstances connected with those notes. It was not sufficient if they believed that, as a matter of law, the new agreements would protect them. They must have believed the facts stated, and in good faith relied upon them. Shapley v. Abbott, 42 N. Y. 443, 1 Am. Rep. 548. The court says, referring to cases where it has been held that a party may be prevented by estoppel from availing himself of the defense of usury: "In all cases there was the representation of a fact, to wit, that there was no usury, to a party ignorant of the truth and who relied upon the representation. But suppose the representation had been made to a party who knew of the usury, or suppose there had simply been a promise not to plead usury, would the courts have held that there was any estoppel?" The judge, writing the opinion further, says, "No case has occurred to me in which a party can in advance make a valid promise that a statute founded in public policy shall be inoperative." In the case of Wilcox v. Howell, 44 N. Y. 398, the action was to foreclose a mortgage. Simultaneously with the execution of the mortgage, the mortgagor had given a declaration that it was for good and valid consideration and subject to no offset or defense. It was held that the mortgagor was not estopped from setting up fraud in the procurement of the mortgage because the mortgagee knew of the facts at the time when the agreement was made, and that he could not have the benefit of an estoppel unless he believed and relied upon the statement of facts then made.

The claimant, Sebring, is in no better position than was his assignor, the Westchester Trust Company. The notes were transferred to him after maturity, and for a nominal consideration. He took the notes subject to all defenses. He has not appeared personally in this proceeding, and is apparently an agent or representative of the trust company. See Chester v. Dorr, 41 N. Y. 279.

The last contention of the trustee is that the claimant has not accounted for security which was available on account of these notes. There were some shares of stock and a bill· of sale which the trust company had taken

from Dickson as security which appear to have been of no value, and were given up when notes were accepted. (Minutes, Jan. 22, 1907, pp. 98, 108.) These need not be considered. The only other security referred to is the $50,000 mortgage. It would seem that, upon equitable principles, such accounting should be had if the notes can be sustained. It is a just inference from the testimony that the present claimant represents the Westchester Trust Company, and is claiming in its interest. It appears that, just prior to the making and delivery of the notes in question, the trust company took from Deyo this mortgage, covering a considerable amount of property, as security for his indebtedness to it. What exactly that indebtedness was which the mortgage was intended to cover, is not clearly shown by the evidence. The obligations of Deyo and Dickson were closely related, and Deyo indorsed for Dickson immediately after giving the mortgage. This mortgage and the notes both grew out of one series of transactions. In the circumstances of the case, it is at least questionable whether the trust company was not entitled to hold this mortgage as security for Deyo's indorsement, as well as for his direct indebtedness. There is nothing in the evidence to show that they could not. The intimations are that the property covered by the mortgage was of great value, and there is nothing to show what has become of it. There is no testimony before the court to show what has been done with that mortgage, nor whether the company may not have received something from it, or through it, to the benefit of which Andrew Deyo, as indorser of these notes, and Nathaniel Lawrence, as indorser after Deyo, should be entitled.

I have considered carefully all the authorities cited by the respective parties, and also their able and elaborate briefs, and upon the whole case I am of opinion that the claim in question should be disallowed.

## The following is the opinion of Holt, District Judge.

A petition for review having been filed herein on behalf of Abram Sebring, the above-named claimant, to reverse the decision and report to the referee in bankruptcy herein disallowing the claim of said Abram Sebring, and the aforesaid referee having made his report and certified to this court all the evidence and papers in relation thereto, and after hearing Ralph Earl Prime, Jr., Esq., on behalf of the aforesaid claimant in support of said petition and motion, and Albert Reynaud, Esq., on behalf of the trustee in opposition thereto, and after due consideration of the aforesaid decision and report of the referee, and on motion of Albert Reynaud, Esq., attorney for the aforesaid trustee, it is ordered that the said petition and motion be, and the same hereby are, denied, and the aforesaid decision and report of the referee disallowing the claim of said Abram Sebring are hereby affirmed.

R. E. and A. J. Prime, for appellant.

Albert Reynaud, for appellees.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. Affirmed on report of referee in bankruptcy.