### FIDELITY & DEPOSIT CO. OF MARYLAND v. GRAND NAT. BANK OF ST. LOUIS.

No. 9775.

Circuit Court of Appeals, Eighth Circuit.

Feb. 10, 1934.

Henry Davis, of St. Louis, Mo. (Bryan, Williams, Cave & McPheeters, of St. Louis, Mo., on the brief), for appellant.

Courtney S. Goodman, of St. Louis, Mo. (Charles G. Revelle, of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and BOOTH, Circuit Judges.

GARDNER, Circuit Judge.

The appellant, as plaintiff, brought this action to recover from the appellee the sum of $81,014.36, under the provisions of a policy of robbery insurance. The parties will be referred to as they were designated in the lower court.

The defendant, pleading various special matters in defense, pleaded a counterclaim in the sum of $10,325.91, and also a counterclaim in the sum of $3,600 for alleged loss or shortage of cash by a teller. Plaintiff put in issue the allegations contained in the counterclaims by reply, and asked judgment as prayed in its complaint.

Plaintiff is engaged in the business of executing surety bonds and robbery insurance, while defendant, at the times mentioned in

the pleadings, was a national banking association in St. Louis, Mo.

On May 25, 1930, robbers entered defendant's bank and forcibly took from persons in charge $46,895.82 in cash, negotiable bonds of the face value of $236,950, and corporate stock certificates of a par value of $45,070; these last-named certificates having been pledged to the bank as security for loans. Bonds belonging to customers of the bank, which had been placed in safety deposit boxes in the bank, of the par value of $587,050, were also taken by the robbers. At the time of the robbery defendant held two Bankers' Blanket bonds, or insurance policies, which had been issued by plaintiff, by the terms of which plaintiff agreed to indemnify defendant in an amount not to exceed $125,000 and in an amount not to exceed $25,000, respectively, against direct loss of any money or securities through robbery. These two insurance policies covered the loss of the cash and bonds and the stocks pledged to the bank, but did not cover the bonds of the customers of the bank of the par value of $587,050, deposited in safety deposit boxes in the bank. Plaintiff paid to defendant on account of its liability resulting from such robbery the sum of $125,000.

Each of the policies provided that in case of recovery, whether made by the insured or the insurer, from any source other than insurance or security, the net amount, less the actual cost and expense of making the recovery, should be applied to reimburse the insured in full for the loss, and the excess, if any, should be paid to the insurer. It is on this provision of the policy that plaintiff seeks recovery in this action.

Subsequent to the settlement of the liability, in December, 1930, Emmett Myers, manager and resident vice president of plaintiff, had a conversation with a Mr. Foristel, a St. Louis lawyer, with reference to a possible recovery of the stolen securities. In this conversation Foristel told Myers that he had information that the bonds were in possession of a man who would return them to the bank for a valuable consideration. This was reported to the president of the bank, as shown by the testimony of Mr. Myers, who testified that: "I reported that to Mr. Mays, and after various negotiations with him he agreed to pay $140,000.00 for the return of the bonds, and did pay that. I discussed the matter with him on more than one occasion. The approximate date when he agreed to pay a consideration of $140,000.00 for a return of the securities was January 15, 1931."

On January 19, 1931, the defendant bank, by its attorneys, submitted two letters to Myers. In one it agreed to pay $65,000 "upon delivery to it" of certain of the securities. In the other it agreed to pay $75,000 for the remainder of the securities. Mr. Mays, referring to the agreement, testified as follows: "After he returned from Europe Mr. Myers came out there and said that he was in touch with the underworld and that he could get the bonds back for $200,000. I asked him what about it and he agreed with me that it was too much. He went back to see if they would do any better. He came back later and probably made a half dozen trips until we finally agreed that we would give them $140,000.00."

There was other testimony concerning the transaction, but the above-quoted evidence fairly reflects the agreement so far as the issues involved in this case are concerned.

On February 20, 1931, Myers paid an agent of the robbers the $140,000 and received the stolen bonds, which were turned over to defendant. It is the claim of the plaintiff that following the recovery of the bonds it was entitled to be repaid all that it had paid to the defendant, except the cash amounting to $46,895.82, and the $159.82 which the defendant had paid for duplicate stock certificates, totaling $47,055.64, and that it should recover the difference, or $77,944.36. This claim is based upon the provisions of its insurance contract, on the theory that it had paid for the loss of property subsequently recovered by the insured.

The defendant's counterclaim alleged that the two policies provided that in the event of recovery of stolen property, the net amount of the recovery should be repaid to plaintiff, less the actual cost and expense of making recovery, and that it paid for the recovery of the bonds which had been pledged to it, the sum of $40,356.44. It also pleaded a counterclaim for $3,600 for an alleged loss or shortage of cash by a teller. In view of the disposition made of the case by the trial court, this last noted counterclaim is the only one that need be referred to. On this counterclaim the lower court held that the evidence failed to show a loss for which plaintiff was liable. The other counterclaims, as well as plaintiff's cause of action, were dismissed by the lower court because it was of the opinion that the evidence showed a contract against public policy, having for its purpose the concealment of a crime, and hence the parties were left where they had placed themselves.

In determining whether the contract in question contravenes the public policy of Mis-

souri, the laws and judicial decisions of that state, as well as the applicable principles of common law are to be consulted. Whether a contract is against public policy does not depend solely upon any local statute or usage, and the national courts exercise concurrent jurisdiction with those of the state, but will give the decisions of the state in which the contract was executed and is to be carried out the weight of persuasive authority. Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788; Bucher v. Cheshire R. R. Co., 125 U. S. 555, 8 S. Ct. 974, 31 L. Ed. 795; Hartford Fire Ins. Co. v. Chicago, etc., R. Co., 175 U. S. 91, 20 S. Ct. 33, 44 L. Ed. 84; Black & White T. & T. Co. v. Brown & Yellow T. & T. Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426; Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 51 S. Ct. 476, 75 L. Ed. 1112, 83 A. L. R. 1168; Northwestern Mutual Life Ins. Co. v. Johnson, 254 U. S. 96, 41 S. Ct. 47, 65 L. Ed. 155.

■ An agreement to stifle a prosecution, suppress evidence, compound an offense, or conceal a crime which has been committed is void because it is contrary to public policy. Section 3894, Revised Statutes of Missouri 1929 (Mo. St. Ann. § 3894, p. 2746); In re Lawrence (C. C. A. 2) 166 F. 239; Rutherford v. Elliott (C. C. A. 6) 23 F. (2d) 250; Small v. Lowrey, 166 Mo. App. 108, 148 S. W. 132; Ridenbaugh v. Young, 145 Mo. 274, 46 S. W. 959; Ogden v. Ford, 179 Cal. 243, 176 P. 165; Case v. Smith, 107 Mich. 416, 65 N. W. 279, 31 L. R. A. 282, 61 Am. St. Rep. 341; Jones v. Henderson, 189 Ky. 412, 225 S. W. 34, 20 A. L. R. 1471; Aycock v. Gill, 183 N. C. 271, 111 S. E. 342, 24 A. L. R. 1449; Citizens' Nat. Bank v. Polski, 122 Neb. 658, 241 N. W. 110; Josephs v. Briant, 108 Ark. 171, 157 S. W. 136; Goodrum v. Merchants' & Planters' Bank, 102 Ark. 326, 144 S. W. 198, Ann. Cas. 1914A, 511; Haines & Lyman v. Lewis, 54 Iowa, 301, 6 N. W. 495, 37 Am. Rep. 202; Friend v. Miller, 52 Kan. 139, 34 P. 397, 39 Am. St. Rep. 340; Young v. Thomsom, 14 Colo. App. 294, 59 P. 1030; Roy v. Harney Peak Tin Mining, etc., Co., 21 S. D. 140, 110 N. W. 106, 9 L. R. A. (N. S.) 529, 130 Am. St. Rep. 706.

■■ Section 3894, Revised Statutes of Missouri 1929 (Mo. St. Ann. § 3894, p. 2746), reads as follows: "Compounding felonies.— Every person having a knowledge of the actual commission of any offense punishable by death, or by imprisonment in the penitentiary, who shall take any money or property of another, or any gratuity or reward, or any promise, undertaking or engagement therefor, upon agreement or understanding, express or implied, to compound or conceal such crime, or to abstain from any prosecution therefor, or withhold any evidence thereof, shall, upon conviction, be punished by imprisonment in the penitentiary for a term not exceeding five years."

The lower court based its decision largely upon this statute, which we think is not broader than the common law principles applicable. It is observed in passing, however, that this statute covers only a case where a person shall take money or property of another, or a gratuity or reward, while in the instant case, there is no claim that the plaintiff or the defendant took or received, or had any agreement for taking or receiving, any money or property "of another." The property for which they were negotiating was property in which they at least had a special property, and in which they were representing its owners. The defendant was either the owner or the bailee of the stolen bonds. It had a right to their possession, and the property was not the property of the robbers; hence, securing the return of this property was not a gratuity nor a reward, as the defendant was getting back what it was entitled to receive. Where property has been stolen or money embezzled, it is not unlawful for the wrongdoer to make restitution and to satisfy the civil liability created by the wrong. Neither does the law prevent one whose property has been stolen or embezzled through the commission of a crime, to compromise with the wrongdoer, if it is not agreed, either expressly or impliedly, that the prosecution for the offense shall be suppressed or stayed. So long as there is not included as part of the consideration any agreement, express or implied, that a criminal prosecution shall be suppressed, stifled, or stayed the contract should be sustained. Restatement Law of Contracts, § 548; McCoy v. Green, 83 Mo. 626; Schirm v. Wieman, 101 Md. 541, 63 A. 1056, 1057, 7 L. R. A. (N. S.) 175, 115 Am. St. Rep. 373, 7 Ann. Cas. 1008; Blair Milling Co. v. Fruitiger, 113 Kan. 432, 215 P. 286, 32 A. L. R. 416; Lomax v. Colorado Nat. Bank, 46 Colo. 229, 104 P. 85; Goodrum v. Merchants' & Planters' Bank, 102 Ark. 326, 144 S. W. 198, Ann. Cas. 1914A, 511; Powell v. Flanary, 109 Ky. 342, 59 S. W. 5; Utterback v. Farmers' Nat. Bank, 228 Ky. 827, 16 S.W.(2d) 453; Provident Savings Life Assur. Society v. Edmonds, 95 Tenn. 53, 31 S. W. 168; Deere v. Wolff, 65 Iowa, 32, 21 N. W. 168; Cass County Bank v. Bricker, 34 Neb. 516, 52 N. W. 575, 33 Am.

St. Rep. 649; Board of Education v. Angel, 75 W. Va. 747, 84 S. E. 747, L. R. A. 1915E, 139; Ogden v. Ford, 179 Cal. 243, 176 P. 165; Grandin Investment Co. v. Hartung, 49 N. D. 364, 191 N. W. 783.

In this country, contrary to the rule prevailing in England, the general rule is that a civil action may be maintained against a thief or a robber to recover stolen property or its value, prior to or pending a prosecution for the crime. Downs v. Baltimore, 111 Md. 674, 76 A. 861, 41 L. R. A. (N. S.) 255, 19 Ann. Cas. 644. In the Restatement of the Law of Contracts by American Law Institute, § 548, the rule is thus stated: "Where an act is a crime and also creates a claim for damages, a bargain for the settlement of that claim is not illegal whether or not prosecution for the crime has begun."

By way of illustration, it is said in this text: "A embezzles money from his employer B. A's father C gives B a note for the amount embezzled in consideration of B's promise not to prosecute A. The bargain is illegal and neither party can recover for its breach. If C had given the note in satisfaction of B's civil right against A in the hope that B would not prosecute, but without any agreement to that effect, C's note would not be illegal, although B refrains from prosecuting as a consequence of receiving it."

There was no evidence indicating that there was an express agreement that the defendant should suppress evidence of the commission of the robbery, but the lower court was of the opinion that the parties impliedly agreed to consummate the matter in hand in such a manner as to prevent the officers of the law from securing any information as to who the offenders were, who represented them, where the securities were concealed, and who had them in their possession. This wrongful purpose, the court held, was clearly a part of the whole undertaking, and hence, regardless of whether the parties compounded a felony or became accessories after the fact, they consummated a transaction that could not be justified under the law. It is true that the unlawful agreement need not be an express one, if, from the evidence, facts, and circumstances, it may be fairly implied. Mississippi Valley Trust. Co. v. Begley, 298 Mo. 684, 252 S. W. 76. It should first be observed that to imply such an agreement imputes to the parties the commission of a crime. The law, of course, presumes that every one is innocent and not guilty of the commission of a crime, so that the burden of proof rests upon him who asserts or seeks to establish the contrary.

The evidence is undisputed that the contract of the parties here in question was directed to one specific object, and that was the recovery of the stolen property and its restoration to the defendant to whom it belonged, and the object of the robbers was to procure money in payment for its restoration. Whether or not there was a valid consideration for the payment of the money is not material to the question of the alleged illegality of the contract as against public policy. If the transaction is to be held void as against public policy, it must be because of the implication of an agreement to conceal an offense, suppress evidence, stifle a prosecution, or compound a felony.

An implied agreement, like an express one, must be based upon evidence. The difference between an express and an implied contract is largely in the manner of establishing that there was a manifestation of assent. Although an agreement to compound a felony or settle a prosecution may be implied from facts and circumstances, yet the law will not impute a promise where it would be unjust to the party to whom it would be imputed, and where, as in the instant case, it would imply a promise to do not only an illegal but a criminal act. If, however, the circumstances warranted the lower court in finding that there was an implied agreement not to prosecute, or an agreement to conceal the robbery, then the contract with the robbers was void as contrary to public policy. The mere expectation of the robbers, however, that a criminal prosecution would not follow if the property were turned over, is not sufficient in itself to show either an express or an implied agreement to that effect. School District No. 61 v. Alderson (Collins), 6 Dak. 145, 41 N. W. 466; Moog v. Strang, 69 Ala. 98.

In Moog v. Strang, supra, it is said that the law does not "seek to control the hope or expectations of the offender. He may very reasonably, in many cases, expect that the prompt settlement of a discovered defalcation may tend to paralyze the energy of an incipient prosecution, and, however reprehensible the motives of the parties, they are not cognizable by the courts so long as their minds fall short of concurring in an agreement, express or implied, to compound or not to prosecute, as the consideration, in part or in whole, of the payment of the debt or damages resulting from the crime committed."

In the instant case, the robbers may have been actuated by the hope not only of making a gain, but by the hope that a prose-

182

cution might be deterred. The plaintiff and defendant, however, may have had no other thought in mind than that secrecy was essential to carrying out the agreement for restoration and recovery of a vast amount of property, and with the thought that any publicity would interfere with the negotiations for its recovery. To sustain the position of the lower court, the evidence must show a manifestation of assent of all the parties to an unlawful agreement. This, we think, the evidence does not necessarily show. Marbury v. Brooks, 7 Wheat. 556, 577, 5 L. Ed. 522; Fosdick v. Van Arsdale, 74 Mich. 302, 41 N. W. 931; School Dist. No. 61 v. Alderson (Collins), 6 Dak. 145, 41 N. W. 466, 469; Deere v. Wolff, 65 Iowa, 32, 21 N. W. 168, 171.

In Marbury v. Brooks, supra, the Supreme Court said:

"The fact, in its strongest aspect, is, that a deed was made, giving this preference, in the hope that it would propitiate the preferred creditors, and prevent their being so active as they might otherwise be in proceeding against the criminal. But the facts, as they stand show no agreement made at any time to forbear to prosecute, nor that the interest of the creditors would be in any manner affected by the institution of a prosecution, and carrying it on to the conviction of the offender.

"If Fitzhugh had remained, and his crime had not been discovered, he might have sold all the property comprised in this deed, and might have applied the money to the notes he had counterfeited. His hope that this act would conceal the crime, and save him from punishment, would not have vitiated the transaction."

In School District No. 61 v. Alderson (Collins), supra, it is said: "But it must clearly appear, where other considerations apparently or necessarily enter into the contract, that the contract was in part based upon the illegal consideration; and it is incumbent upon the party who alleges such illegal consideration to prove it. The burden is upon him to overcome all fair presumptions arising from the evidence in favor of the legality of the contract."

In Deere v. Wolff, supra, there was involved a transaction whereby property was delivered in exchange for certain forged notes. It was urged, as in the instant case, that the necessary effect of the surrender of the forged paper was at least to obstruct a prosecution for the crime, and hence the transaction was illegal. The court held, however, that while the result of the surrender of the forged pa-

per would be to make it more difficult to prove the crime, still the aggrieved party had the right to accept payment of the forged paper, and hence, having surrendered it in the exercise of a lawful right, it could not be said that there was a contract contrary to public policy. The court said: "If the bank was lawfully authorized to deliver the forged paper upon its payment by Wolff, and such delivery hindered or tended to hinder a prosecution, this was the necessary result of the delivery, and, if intended, such intent was not in violation of law, public policy, or good morals, as it was entertained in the exercise of the lawful right of the bank; for the delivery of the paper, which is inseparable from the intent, was alone in obedience to the requirements of the law imposing the duty upon the holder of paper to surrender it upon payment when required to do so."

It is urged that the circumstantial evidence sustains the conclusion of the court that a contract against public policy had been entered into. But, as we have pointed out, the plaintiff and defendant may well have entered into and consummated this transaction with none other than lawful and proper motives. Even though we concede that the motive of the robbers was improper, and their expectation was, if not to thwart, at least to delay a criminal prosecution, still, with the evidence on this phase of the transaction wholly circumstantial, the rule is applicable that: "When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. A verdict in favor of the party bound to maintain one of those propositions against the other is essentially wrong." United States Fidelity & Guaranty Co. v. Des Moines Nat'l Bank (C. C. A. 8) 145 F. 273, 280; Eggen v. United States (C. C. A. 8) 58 F.(2d) 616; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 393, 77 L. Ed. 819; Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699; Cotten v. Halverson, 201 Iowa, 636, 207 N. W. 795, 798; Liggett & Myers Tobacco Co. v. De Parcq (C. C. A. 8) 66 F.(2d) 678, 684.

In Cotten v. Halverson, supra, the defendant interposed the defense of compounding a felony. The Supreme Court of Iowa, holding that the defense was not sustained, said: "It is apparent, therefore, from the record, that the statement that Cotten had kept Halverson out of trouble might as well apply to the financial aid he gave him at the time he took over his town property as to the trans-

action out of which the mortgage and note sued on herein grew. One is as equally probable as the other. Where it is attempted to prove a fact by circumstantial evidence it is well settled that the theory claimed must exclude every other reasonable hypothesis."

In Pennsylvania R. Co. v. Chamberlain, supra, in an opinion by Mr. Justice Sutherland, it is said: "We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover."

In Liggett & Myers Tobacco Co. v. De Parcq, supra, we said: "If that were the cause of the accident, then the defendant is not liable, and, where proven facts give equal support to each of two inconsistent inferences, judgment must go against the party upon whom rests the burden of sustaining one of these inferences as against the other."

▉▉ There is a presumption not only of innocence, but of good faith. There is a presumption that business is conducted lawfully, Missouri Pacific R. Co. v. Prude, 265 U. S. 99, 44 S. Ct. 450, 68 L. Ed. 919, and that all things are rightly done, Chesapeake & O. R. Co. v. De Atley, 241 U. S. 310, 36 S. Ct. 564, 60 L. Ed. 1016; and where the act of a party may be referred indifferently to one of two motives, the law prefers to refer it to that which is honest, rather than to that which is dishonest, Alexander v. Fidelity Trust Co. (C. C. A. 3) 249 F. 1. As said by this court in American Surety Co. v. Citizens' Natl. Bank (C. C. A. 8) 294 F. 609, 616: "Until there be reasonable ground to think otherwise, a presumption prevails that one acts honestly and keeps within the requirements of the law."

In the case of Schirm v. Wieman, supra, the Supreme Court of Maryland, in a case strikingly similar to the case at bar, held that the person from whom property has been stolen could properly pay an agent of the thief for its return, and that the transaction was not contrary to public policy. In the course of the opinion the court said: "There can be no reason assigned why the owner of stolen property cannot pursue his own interest as he deems proper, so long as there is no interference with the proper enforcement of the laws in the pursuit, apprehension, and conviction of the criminal."

▉▉ Courts do not lightly hold contracts void as being contrary to public policy. Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 51 S. Ct. 476, 477, 75 L. Ed. 1112, 83 A. L. R. 1168; Black & White T. & T. Co. v. Brown & Yellow T. & T. Co., 276 U. S. 518, 48 S. Ct. 404, 407, 72 L. Ed. 681, 57 A. L. R. 426; Swann v. Swann (C. C.) 21 F. 299; School Dist. No. 61 v. Alderson (Collins), 6 Dak. 145, 41 N. W. 666. In Twin City Pipe Line Co. v. Harding Glass Co., supra, the Supreme Court said: "The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests."

In Black & White T. & T. Co. v. Brown & Yellow T. & T. Co., supra, it is said: "Care is to be observed lest the doctrine that a contract is void as against public policy be unreasonably extended. Detriment to the public interest is not to be presumed in the absence of showing that something improper is done or contemplated. Steele v. Drummond, 275 U. S. 199, 48 S. Ct. 53, 72 L. Ed. 238. And it is to be remembered, as stated by Sir George Jessel, M. R., in Printing Company v. Sampson, L. R. 19 Eq. 462, 465, that public policy requires that competent persons 'shall have the utmost liberty of contracting, and that their contracts, when entered into fairly and voluntarily, shall be held sacred, and shall be enforced by courts of justice.' "

▉▉ A careful study of this record convinces us that there is no substantial evidence sustaining the finding or conclusion that the contract by which the defendant secured a restoration of its property from the robbers was void as against public policy.

▉▉ The lower court considered the case upon the theory that plaintiff's cause of action was dependent upon the validity of the contract by which the defendant secured a restoration of its property. The action, however, is not based upon that contract, but upon its contract of insurance entered into long prior to the questioned transaction by which the defendant secured a return of its property. The validity of the contract upon which the action is based is not questioned. So far as the contract between the defendant and the robbers is concerned, it was fully executed by the parties before the institution of this action. The property which the defendant secured was undoubtedly its property, regardless of the method by which it may have secured its return, and under the terms of the insurance contract plaintiff was entitled to recover the amount of the returned property less certain offsets.

184

It is important to bear in mind that the questioned transaction was a completed one, and the plaintiff is not asking to divide up the profits of an illegal transaction, but is asking for the enforcement of a perfectly legal contract. Under these conditions the defendant cannot set up as a defense the illegality of the contract by which it secured a return of its property. McBlair v. Gibbes, 17 How. (58 U. S.) 232, 15 L. Ed. 132; Brooks v. Martin, 2 Wall. (69 U. S.) 70, 80, 17 L. Ed. 732; Planters' Bank v. Union Bank, 16 Wall. (83 U. S.) 483, 499, 21 L. Ed. 473; Union Pacific R. R. Co. v. Durant, 95 U. S. 576, 578, 24 L. Ed. 391; Western Union Telegraph Co. v. Union Pacific Ry. Co. (C. C.) 3 F. 423; Cook v. Sherman (C. C.) 20 F. 167, 170; Thompson v. Lyons, 281 Mo. 430, 220 S. W. 942, 948; Hobbs v. Boatright, 195 Mo. 693, 93 S. W. 934, 5 L. R. A. (N. S.) 906, 113 Am. St. Rep. 709.

In Brooks v. Martin, supra, there was considered a partnership transaction. These transactions were to some extent at least illegal in that they were violative of certain federal statutes, and this was pleaded as a defense. In the course of the opinion by Mr. Justice Miller, it is, among other things, said: "There were then in the hands of defendant, lands, money, notes, and mortgages, the results of the partnership business, the original capital for which plaintiff had advanced. It is to have an account of these funds, and a division of these proceeds, that this bill is filed. Does it lie in the mouth of the partner who has, by fraudulent means, obtained possession and control of all these funds, to refuse to do equity to his other partners, because of the wrong originally done or intended to the soldier? It is difficult to perceive how the statute, enacted for the benefit of the soldier, is to be rendered any more effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner; or what rule of public morals will be weakened by compelling him to do so. The title to the lands is not rendered void by the statute. It interposes no obstacle to the collection of the notes and mortgages. The transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case."

Quoting with approval from an English case, it is further said: "As between these two, can this supposed evasion of the law be set up as a defence by one against the otherwise clear title of the other? Can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that, in realizing it, some provision or some act of Parliament has been violated or neglected? * * * The answer to this, as to the former case, will be, that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do between the parties."

In Planters' Bank v. Union Bank, supra, it is said: "Nor should the court have charged that, in the circumstances of this case, no action would lie for the proceeds of the sales of Confederate bonds which had been sent by the plaintiffs to the defendants for sale, and which had been sold by them, though the proceeds had been carried to the credit of the plaintiffs and made a part of the accounts. It may be that no action would lie against a purchaser of the bonds, or against the defendants on any engagement made by them to sell. Such a contract would have been illegal. But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiffs, the case is different. The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them."

The same principle is announced in Union Pacific R. R. Co. v. Durant, supra, where it is said:

"But it is said the conveyances grew out of an illegal transaction between the company and the grantors. To this there are several answers. The grantors have voluntarily executed the contract. They have not intervened, and do not complain.

"The conveyances to the trustee were, in the view of the law, the same thing as if they had been to the company. The transaction between the parties in interest was thus finally closed. There will be neither more nor less of illegality between the original parties, whether the trustee does or does not respond to his obligation to the company. *In that obligation there is no pretence for saying there is any taint of any kind; and it is that obligation alone which it is sought to enforce by this proceeding.*" (Italics supplied.)

In Cook v. Sherman, supra, in an opinion by Circuit Judge McCrary, it is said:

"This brings us to the consideration of the second question, which is, have the complainants shown themselves entitled to relief independently of the illegal contract? It has been decided by the supreme court of the United States that 'where several persons enter into an illegal contract for their own benefit, and the illegal transaction has been consummated, and the proceeds of the enterprise have been actually received and carried to the credit of one of such parties, so that he can maintain an action therefor without requiring the aid of the illegal transaction to establish his case, he may be entitled to relief.' Brooks v. Martin, 2 Wall. 70 [17 L. Ed. 732]; Planters' Bank v. Union Bank, 16 Wall. 483 [21 L. Ed. 473]. * * *

"According to this rule, the question in such cases must always be, can the plaintiff maintain his action without enforcing the illegal contract? or, in other words, has he a cause of action independently of the illegal contract? If it appears that the defendants in a given case have received money or property from the complainants, and which belongs to the latter, the same may be recovered without any inquiry into the nature of the contract under which such money or property was acquired. The distinction is between enforcing an illegal contract and asserting title to money and property which has arisen from it."

The decisions of the Supreme Court of Missouri are in accord with the foregoing authorities. Thus, in Thompson v. Lyons, supra, it is, among other things, said:

"The difference between enforcing illegal contracts and asserting title to money which has arisen from them, or alleging fraud in being induced to enter them, is pointed out in numbers of cases. * * *

"In this case, if, by some stretch of construction, it may be said that plaintiffs were led to enter the deal because defendants represented that they would unlawfully procure a sale of the land on account of their official positions, the plaintiffs probably could not have enforced the contract in any kind of an action; but, if the defendants by misrepresentations of certain facts induced the plaintiffs to enter the illegal contract, and defrauded them of their money, they cannot resist recovery on the ground that the scheme was unlawful."

So, in the instant case, it seems clear that the plaintiff is not asking the court to give any force or effect whatever to the contract by which the defendant recovered the stolen assets. That contract, as we have before said,

has been fully consummated by the parties. No one is asking to enforce it, and no one is complaining about it.

The court dismissed defendants' counterclaim for $3,600. There has been no cross-appeal by the defendant, and that part of the judgment is therefore affirmed. We conclude that the court erred as a matter of law in holding that the plaintiff could not recover because of the nature of the transactions involved, and the judgment appealed from, in so far as it affects plaintiff's cause of action, is reversed, and the cause is remanded to the lower court with directions to grant the plaintiff a new trial.