### ALL v. ALL et al.

(District Court, E. D. South Carolina. March 30, 1918. On Petition for Rehearing, May 27, 1918.)

1. LIMITATION OF ACTIONS ⬤⇒36(3)—APPLICATION OF STATUTE—EQUITY SUITS.
   Code Civ. Proc. S. C. 1912, § 137, subd. 6, prescribing a six-year limitation, does not apply to a suit to cancel a conveyance of South Carolina lands on the ground that the consideration for the conveyance, which was the suppression of criminal proceedings, was illegal.

2. JUDGMENT ⬤⇒707—CONCLUSIVENESS—PERSONS NOT PARTIES.
   Complainant to secure a claim of a bank against her son, which it was recognized would furnish the basis of criminal prosecution, conveyed a parcel of her separate property to another son, who in turn mortgaged it to the bank to secure such claim. Thereupon, though complainant was not ousted from possession, the bank foreclosed its mortgage. Held that, as the bank was conversant with the circumstances of the transaction and failed to make complainant a party to the foreclosure proceedings, complainant was not estopped thereafter to assert the invalidity of the transaction because she did not actively intervene and resist foreclosure.

3. DEEDS ⬤⇒1—INVALIDITY OF CONSIDERATION—WHAT LAW GOVERNS.
   The validity of a deed made in South Carolina, covering real property therein located, must be determined according to the laws of that state.

4. DEEDS ⬤⇒73—CONSIDERATION—COMPOUNDING FELONY.
   A conveyance of South Carolina lands, executed in that state and intended to prevent the institution of a criminal prosecution against a child of the grantor, is based on an illegal consideration according to the laws of that state, and is voidable.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. DEEDS ⧟73—INVALIDITY—COMPOUNDING FELONY.
     Where a mother conveyed land, which was part of her separate prop-
erty, to one son, who mortgaged it to secure a bank upon a claim against
another son, which claim, if recognized by the parties, would serve as a
basis for criminal proceedings against such son, and the bank was reason-
ably charged with knowledge that the motive actuating the mother was
to prevent the prosecution, the conveyance is voidable on the ground of
the illegality of the consideration, being really one to stifle a criminal
prosecution, which contracts are always voidable.

6. VENDOR AND PURCHASER ⧟244—BONA FIDE PURCHASE—EVIDENCE.
     In a suit to set aside a conveyance on the ground that the consideration
was tainted with illegality, because the real purpose was to prevent the
institution of criminal proceedings against the grantor's son, evidence *held*
to show that the defendant bank, the beneficiary of the conveyance, was
chargeable with knowledge that the motive actuating the grantor in
making the conveyance was to save her son from prosecution.

7. DEEDS ⧟77—COMPOUNDING FELONY—RELIEF TO PARTIES.
     While there is a large class of cases holding that, in case contracts are
invalid on account of illegality of consideration, the courts will leave the
parties where they find them, yet where a mother, to save her son from
criminal prosecution, conveyed her land to another, who mortgaged it
to a bank, which had a claim against him, and the mother remained in
possession of the land after her conveyance, and even after the bank's
foreclosure of its mortgage, a court of equity will set aside the con-
veyance.

### On Petition for Rehearing.

8. EVIDENCE ⧟580—ADMISSIBILITY—TESTIMONY IN FORMER ACTION.
     Where complainant conveyed a parcel of her separate property to one
son, and he mortgaged it, evidence heard in the mortgage foreclosure suit,
to which complainant was not a party, is inadmissible against her.

9. JUDGMENT ⧟707—CONSENT DECREE—EFFECT AS TO THIRD PERSONS.
     As the foreclosure decree was by consent, and was practically nothing
more than a contractual matter between the parties, no judicial conclu-
sions, either of fact or law, being found by the court, it is of no force
against complainant, so far as determining any rights of hers is concerned.

10. DEEDS ⧟77—INVALIDITY—RIGHT TO CONTEST—"EXECUTED CONTRACT."
     An "executed contract" is one which has been so entirely performed by
both parties that nothing remains to be done by either; hence a convey-
ance by complainant to one son, who mortgaged the premises to defend-
ant, is not an executed contract, where complainant remained in posses-
sion, and she may attack the conveyance on the ground that it was made
to stifle a criminal prosecution against another son.

     . [Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Executed Contract.]

     In Equity. Bill by T. Gertrude All against Harry W. All and the
National Bank of Savannah. Decree for complainant.

     James A. Willis, of Barnwell, S. C., John W. Vincent, of Hampton,
S. C., and C. Carroll Simms, of Barnwell, S. C., for plaintiff.
     McCullough, Martin & Blythe, of Greenville, S. C., and Garrard &
Gazan, of Savannah, Ga., for defendants.

     SMITH, District Judge. This is a proceeding of an equitable char-
acter, originally instituted in the court of common pleas for Barn-
well county on January 4, 1917, and removed from that court to this
court by the defendant, on the ground that there was a separable con-

troversy between the complainant, T. Gertrude All, a citizen of South Carolina, and the defendant the National Bank of Savannah, a citizen of Georgia. The defendant the National Bank of Savannah has duly answered in this court, the testimony has all been taken upon the issues in the cause, and the cause, being ripe for a hearing, has been heard; counsel for both sides having appeared and been heard. The facts are as follows:

One John E. All, the son of the plaintiff, T. Gertrude All, who had been carrying on business in the city of Savannah, was in August, 1910, very heavily indebted to the defendant the National Bank of Savannah. This indebtedness had been contracted by John E. All, who was carrying on business, together with his father, J. H. C. All, under the firm name and style of J. H. C. All & Son. A large part of the indebtedness due by the firm of J. H. C. All & Son or John E. All to the National Bank of Savannah had been contracted under circumstances which were stated to involve the element of criminal liability on the part of John E. All. According to the testimony John E. All had procured from the bank a large loan on the faith of the pledge of bills of lading covering what purported to be a large number of bales of cotton, but which were in fact bales of what are commonly known as linters; that is, a cotton product of a very inferior and cheap sort, which is distinguished by the word "linters," as against cotton, and the loss of the bank by reason of this alleged fraudulent misrepresentation was very large. The action of John E. All in this matter seems to have been considered by John E. All himself, and by his father, mother, and brothers, and also by the bank officials and the bank counsel, as being one which subjected him to criminal prosecution and conviction.

Under these circumstances suggestion seems to have been made to the complainant herein, T. Gertrude All, through her husband or sons, brothers of John E. All, to give some security out of her own separate property to the bank in order to stop all criminal prosecution. At any rate, at conferences held by the bank officers and Mr. Gazan, the bank's counsel, with John E. All, and his brother, Percy All, the suggestion was made by one of the latter that some money or security for the bank might be obtained through the mother of John E. All. Thereupon Mr. Jacob Gazan, one of the attorneys for the defendant the National Bank of Savannah, went to Allendale, the residence of Mrs. All, and had an interview with J. H. C. All, the father, and his wife, the present complainant, T. Gertrude All. There is a conflict of testimony as to what passed at that interview, but the result was that Mr. Gazan understood that Mrs. All agreed to execute a mortgage on the property to secure $15,000 of John E. All's indebtedness to the bank, and returned to Savannah and prepared notes to the extent of $15,000 to be signed by Mrs. T. Gertrude All, together with her mortgage on the premises referred to in the bill of complaint, taken to secure those notes. Mr. Gazan then sent those papers back to the Alls, at Allendale, for execution; but the Alls declined to execute them until the papers were submitted to Mr. J. O. Patterson, a lawyer in Barnwell, and thereupon Mr. Gazan again left Savannah

and went to Barnwell, where he met Mr. All in the office of Mr. Patterson.

The result of the submission to Mr. Patterson and the discussion was that the method adopted to carry out the plan of giving to the bank the benefit of any property Mrs. All consented to give was that she should convey what was called the "river plantation," as described in the bill of complaint herein, to another son by the name of Harry W. All, and that Harry W. All should then execute the mortgage to the bank, thus avoiding any claim against Mrs. All over the value of the land mortgaged. This plan was carried out. Mrs. T. Gertrude All executed the deed of conveyance of the property to her son, Harry W. All, and Harry W. All, having that deed of conveyance made to him, then went to Savannah and executed notes to the National Bank of Savannah for $15,000, and gave a mortgage of the property conveyed to him by his mother to secure those notes, under an agreement that the bank would give him $15,000 for those notes, which he would immediately apply on account of the indebtedness of John E. All to the bank. This was all carried out. The notes and mortgage were executed and delivered in Savannah to the bank. The check for $15,000 was given to Harry W. All, which he immediately, in the presence of the counsel for the bank, indorsed back to the National Bank of Savannah. The result of all these papers was that the bank parted with no money at all, but that it obtained the benefit of the security to the extent of $15,000 on this property of Mrs. All to secure that much of the indebtedness of John E. All to the bank. In addition, the mortgage as executed was not only to secure this $15,000, but purported to secure also all other indebtedness of J. H. C. All & Son to the bank. The bank and its counsel had full knowledge of all these facts, that is, the method taken for making this mortgage, and that the money, when paid to Harry W. All, was in pursuance of a prior understood agreement that he would immediately deliver the check back to the bank to be credited on the indebtedness of John E. All.

Thereafter, Harry W. All having defaulted in payment of the notes, the bank instituted proceedings of foreclosure in this court for foreclosure and sale of the property. To these proceedings Harry W. All was the sole defendant; Mrs. T. Gertrude All not being made a defendant to those proceedings. Those proceedings went to decree of foreclosure and sale, and under the decree of foreclosure the property was put up for sale and bought in by the National Bank of Savannah. From all the testimony it appears as if the possession of the plaintiff, T. Gertrude All, to the land has never really been disturbed; that she has remained ever since, and now is, in the same possession of the property that she had at the time she executed the deed of conveyance to her son Harry W. All.

The complainant has now instituted these proceedings, alleging that the deed of conveyance executed by her to her son Harry W. All was illegal, null, and void, as having been made without consideration, or rather made for an illegal consideration, viz., in order to prevent the criminal prosecution of her son John E. All, and that the bank

was fully aware of the circumstances, and took the mortgage and purchased at the foreclosure sale with full knowledge that the mortgage given to Harry W. All was given on land which had been conveyed to Harry W. All for an illegal consideration by the plaintiff; the conveyance to Harry W. All being only part of the plan to mortgage the land to the bank. The National Bank of Savannah, the defendant, denies that it ever made any threats or representations for the purpose of having the deed and mortgage executed, and alleges that the deed of the plaintiff and the mortgage of Harry W. All were made solely for the purpose of enabling John E. All to make a payment on his indebtedness to the defendant.

[1, 2] The defendant the National Bank of Savannah sets up further that the complainant, having failed to intervene in the foreclosure proceeding against the defendant Harry W. All, is now estopped from bringing a proceeding to annul the deed made by her for illegal purpose, and that the plaintiff is also barred by the statute of limitations (Code Civ. Proc. 1912, § 137, subd. 6), inasmuch as this proceeding was not commenced within six years from the date of the deed. In the opinion of the court the defense of the statute of limitations and the defense of estoppel for failure of the complainant herein to intervene in the foreclosure suit are not well founded. The statutory period of six years prescribed by the Code of Procedure of South Carolina does not apply to equitable proceedings on a claim of the present character, and there was no obligation on the part of the complainant, T. Gertrude All, actively to intervene, and cause herself to be made a party to the foreclosure proceeding against Harry W. All, when the bank, fully aware of all the circumstances, had failed to make her party defendant.

[3, 4] The true issue is as to whether, under the circumstances of this case, the consideration operating to make Mrs. T. Gertrude All execute the deed to her son Harry W. All was an illegal consideration. As all the proceedings were inter partes, and the bank was aware of all that was done, it does not stand in any wise in the position of a third party claiming the benefit of having parted with value without notice. The question is whether or not the consideration was invalid, because illegal, and then whether the bank is bound by any illegality existing in the present case. There is no doubt that at law a contract or payment made by a third party for the purpose of compounding a felony, or of stopping the criminal prosecution of another, constitutes a contract which is voidable. The ground upon which it is voidable, however, according to the adjudicated cases is based upon two separate reasons:

First, a large class of cases places it upon the effect of duress; that is to say, that it is voidable, because it is a contract obtained under duress of actual compulsion, or of duress per minas. The making of a note for the payment of a sum of money, or the mortgage of a piece of land by a third person on behalf of one who is at the time in prison under a criminal charge, or under threat of criminal prosecution for the purpose of procuring his release, or of stopping the prosecution, or of compounding the crime, is declared to be made under a

species of duress, and to be voidable. The claim of duress is not limited to the party charged himself, but is extended to persons standing in a position near and dear to him, such as that of a husband to a wife, a parent to a child, a brother to a sister, or any one standing in such close relationship that in the opinion of the court the grief and apprehension of what is likely to fall upon one near and dear to them would deprive them of the free action of the mind. In these cases much depends upon what is termed the sufficiency, or the existence, of the duress, and the mere fact of giving an obligation or security under such circumstances has not always been held sufficient to avoid a contract. The court has reserved to itself the right of determining under the circumstances of the case whether or not there was such a duress as impaired or affected the free action of the contracting party.

Second, there is a large class of cases, however, which places the invalidity of the contract upon another ground, that is, upon the ground of the contract being illegal in itself as against public policy. It is put in the same class as contracts made for the purpose of compounding a felony, which are unlawful in themselves, as being against public policy. A similar class exists in cases of contracts void for usury, or where the consideration is the permitting of illicit sexual relations, or any class where the consideration is held as void as against public policy or morals. In such cases there is no question of duress existing, but the whole question is whether a contract under the circumstances was one forbidden upon the grounds of public policy. Such last class appears to be the one including cases like the present under the law of the state of South Carolina. According to the adjudicated cases in that state, it is not a question of duress, but a question of the illegality of the consideration of the contract. It seems clearly decided that a contract made by a third party for the purpose of preventing the criminal prosecution of another is illegal, null, and void as against public policy. Corley v. Williams, 1 Bailey (S. C.) 588; Williams v. Walker, 18 S. C. 583; Groesbeck v. Marshall, 44 S. C. 543, 22 S. E. 743; Bleckley v. Goodwin, 51 S. C. 362, 29 S. E. 3; Bankhead v. Shed, 80 S. C. 253, 61 S. E. 425, 16 L. R. A. (N. S.) 971, 15 Ann. Cas. 308.

The deed made by Mrs. All is a South Carolina contract executed by her in South Carolina, and covering real estate situated in the state of South Carolina, and is therefore subject to construction according to the laws of South Carolina, and in the opinion of the court, if the consideration moving Mrs. All in the execution of this deed was that of preventing a criminal prosecution to be instituted against her son John E. All, the consideration was illegal.

[5, 6] As to whether or not this consideration was the one moving Mrs. T. Gertrude All would not appear to be open to much question, so far as the testimony on behalf of the plaintiff is concerned, for, according to the testimony of herself, her husband, and her sons, she was induced to make the conveyance under the apprehension that, unless she did so, her son John E. All would be subjected to criminal prosecution. There is no sufficient testimony in contradiction to show

that the moving cause to her was any desire merely to pay her son's debts. The value of the property seems to have been much less than sufficient to pay all the debts, and there is no evidence that she was actuated by any hope that by making a sacrifice or stripping herself she could free her husband and son of debt. Something more than this, however, appears to be requisite; that is, whatever the consideration moving Mrs. All, was the National Bank of Savannah in any wise a party to or cognizant of it?

On this point there is express and flat conflict of testimony. J. H. C. All, the husband of the complainant, and her son, Percy All, testify explicitly that Mr. Gazan, the attorney for the National Bank of Savannah, told them that they were going to prosecute John E. All criminally for obtaining money under false pretenses, and Mr. Percy All also testifies that he had been sent for to meet Mr. Gazan and the cashier of the National Bank of Savannah at their office, and that then and there he was told that his brother John E. All was short a considerable sum of money, and that they intended to institute criminal proceedings against him, and that unless something was done immediately prosecution would begin. This Mr. Gazan as explicitly denies, and denies that he ever at any time discussed or made mention of any intended criminal prosecution of any kind against John E. All. The circumstances of the case appear to show, however, that Mrs. All had no reason whatsoever for permitting this mortgage to be given to the bank, unless either to make a payment on account of her son's debt, by adopting it herself to that extent, or to give this security, so as to save him from criminal prosecution, and there appears, also, to have been some discussion about the matter, for Mr. Gazan testifies that, at the second meeting between Mr. Gazan and the Alls in Barnwell, the elder All, J. H. C. All, said that before he closed the matter he wanted a writing that there would not be any prosecution of his son, to which Mr. Gazan answered that he had never discussed prosecution with any one, and that, if that was the attitude of Mr. All, they would stop where they were. It is difficult exactly to understand this, for in effect the bank was obtaining security for a debt for which it possessed no security; they were obtaining something for nothing, and to stop right there was to stop upon some proposition that the bank was to obtain something; so it would appear that there was in the minds at least of the parties an idea that there was involved with this matter some question in connection with the criminal liability of John E. All. The cashier of the bank at the time, Mr. Bloodworth, and Mr. Garrard the other member of the firm of Garrard & Gazan, the counsel for the bank, in their testimony make it appear that at the time and prior to the execution of the deed by Mrs. All, and prior to Mr. Gazan's trips to Allendale and Barnwell, the officers of the bank were under the belief that John E. All had committed an offense for which he could be prosecuted criminally. The parties connected with the transaction seem to have all had the knowledge and belief that the acts of John E. All in his dealings with the bank subjected him to a criminal prosecution.

Testing the case from the testimony for the bank itself, and assum-

ing that, as testified by Mr. Gazan and Mr. Bloodworth, no threat or intimation, direct or indirect, was made by any of the bank officials, or any of their counsel, to Mrs. All, or any of the Alls, that unless some payment was made John E. All would be prosecuted criminally, yet the knowledge that such prosecution was possible was in the minds of all, and in that state of mind of all parties the officers of the bank took an active, not a merely passive, part in procuring the conveyance from Mrs. All. From another circumstance it does appear that the officers of the bank took an active part in arranging the procuring of the security. According to the notes and mortgage as at first prepared by Mr. Gazan to be signed by Mrs. All, and which were in pursuance (according to Mr. Gazan's testimony) of Mrs. All's undertaking to secure $15,000 of the indebtedness of J. H. C. All & Son, and which $15,000 represented the entire amount to which according to his testimony Mrs. All was willing to go in mortgaging the place; yet when the deed was made to Harry W. All, although that was made as a method of carrying out what Mrs. All was understood to be willing to do, Harry W. All, in Savannah, having this deed in his possession, in the papers prepared by the counsel of the bank, executed a mortgage to secure not only this $15,000, but also the entire indebtedness of J. H. C. All & Son to the bank; so as that, when the mortgage was foreclosed, it was not foreclosed to subject the land to the payment of $15,000, but to subject it to the payment of $28,681.22, which, with interest, amounted at the date of the decree of sale to $39,728.26.

There are two questions of legal and equitable import to be considered in this matter. One is whether the requirement and rule of public policy makes a contract given or consideration paid, which is brought about by the apprehension in the mind of the grantor that, unless the contract be made or the consideration be paid, a criminal prosecution will be instituted—is that alone sufficient to invalidate the transaction? This would mean, if carried to its logical extreme, that whenever an obligor has paid or contracted to pay under circumstances which rendered him or another liable to criminal prosecution if no such action was taken, then no contract given by any one for the purpose of assisting another by paying or securing a part of his debt could be given when a criminal liability existed in the incurring of the debt, except with the possibility that it might be thereafter declared to be void for illegal consideration. Suppose the case of the defalcation by an employé, although the employer might not intend or wish any criminal proceedings, although he might be even willing to stand the loss rather than subject his guilty employé to punishment, yet nevertheless, if stung or moved, either by mortification or affection for the person through whom the defalcation occurred, some friend or relative of the defaulting party may desire to make good the loss; must the original creditor refuse to receive any such security or payment because he can only receive it at the risk of being thereafter compelled to cancel or refund if the consideration was an illegal one? The argument ab inconvenienti is very strong against the law intending any such conclusion.

On the other hand is the argument that the contract in such cases falls in the category of contracts and considerations forbidden from motives of high public policy. It falls in the same category as usurious contracts, or contracts based upon unlawful considerations; such as illicit sexual relations, or doing any other act forbidden by law, which are sometimes voidable contracts even in the hands of third parties. The objection may not be to the existence of duress, improper influence, or oppression in any particular case. It is to the possibility of the misuse the permitting of such contracts may lead to. The duress may be potent, and yet so subtle, indirect, and concealed, as emanating from the party benefiting, that it may be impossible to establish it, and unless the rule be a general one, that the contract itself be invalid from public policy, the contract would be effective, although well within the rule of public reprobation.

The law for its own purposes, independent of the position of the individual, declares that the apprehension and fear of criminal proceedings and punishment should not be permitted to act knowingly, directly or indirectly, for the purpose of extorting or inducing payments or contracts in order to prevent such prosecution; that the mere circumstance of such a consideration like the element of usury in a contract will so taint the whole transaction as to make it illegal and unenforceable. Whilst it may be very commendable and proper from every moral point of view that a relation, a father or a mother, should be willing to strip themselves bare to conceal the disgrace of a son, yet is it in a correct view of the law proper that such a sacrifice as should from public motives be permitted when it may stifle the prosecution of a criminal and entail the pauperization and the becoming a public burden of one, in order to shield another from punishment?

In considering the matter a mass of decisions of the various states have been gone over, which for this decree need not be here referred to. Those that place the rule upon the ground of duress as it may exist in each particular case need not be considered, under the law in South Carolina that the contract is void not because procured by duress, but because of the illegality of the consideration on grounds of public policy. The reason for its illegality is rather figuratively stated in Collins v. Blantern, 2 Wils. C. P. 347:

"This is a contract to tempt a man to transgress the law, to do that which is injurious to the community. It is void by the common law; and the reason why the common law says such contracts are void is for the public good. You shall not stipulate for iniquity. All writers upon our law agree in this: No polluted hand shall touch the pure fountains of justice."

The meaning of which, according to modern practical jurisprudence, is that no one knowingly deriving a benefit in the way of an obligation to him given by another, under circumstances prohibited by public policy as injurious to the common weal, will be permitted to enforce that obligation in a court of justice. The decision that on all principles of reason seems to the court to lay down the proper rule is the English case, which was first decided by the Chancellor below and reported under the style of Bayley v. Williams in 4 Giff. 658. It was car-

ried on appeal before the law lords in the House of Lords, and reported as Williams v. Bayley, L. R. 1 H. L. 200 (6 English Ruling Cases, 455). The opinions were delivered by the Lord Chancellor (Lord Cranworth), Lord Chelmsford, and Lord Westbury, all good lawyers and judges. The case as stated in the syllabus is as follows:

"A son carried to bankers, of whom he, as well as his father, was a customer, certain promissory notes with his father's name upon them as indorser. These indorsements were forgeries. On one occasion the father's attention was called to the fact that a promissory note of his son, with his (the father's) name on it, was lying at the bankers' dishonored. He seemed to have communicated the fact to the son, who immediately redeemed it; but there was no direct evidence to show whether the father did or did not really understand the nature of the transaction. The fact of the forgery was afterwards discovered; the son did not deny it; the bankers insisted (though without any direct threat of a prosecution) on a settlement, to which the father was to be a party; he consented, and executed an agreement to make an equitable mortgage of his property. The notes, with the forged indorsements, were then delivered up to him. Held, that the agreement was invalid.

"A father, appealed to under such circumstances to take upon himself a civil liability with the knowledge that, unless he does so, his son will be exposed to a criminal prosecution, with a moral certainty of a conviction, even though that is not put forward by any party as the motive for the agreement, is not a free and voluntary agent, and the agreement he makes under such circumstances is not enforceable in equity."

The opinion as delivered by Lord Westbury contains much that is directly applicable to the present case, viz.:

"There are two aspects of this case, or rather two points of view, in which it may be regarded. One of them is: Was the plaintiff a free and voluntary agent, or did he give the security in question under undue pressure exerted by the defendants? That regards the case with respect to the plaintiff alone. The second question regards the case with reference to the defendants alone. Was the transaction, taken independently of the question of pressure, an illegal one, as being contrary to the settled rules and principles of law?"

The evidence showed that the bankers knew that the son of Bayley had committed a forgery for which, when convicted, the punishment was transportation for life; that all parties were conscious of that fact, although the bankers and their solicitors expressly disclaimed considering any matter of criminal prosecution, and declared they could not be parties to compounding a felony. Lord Cranworth, the Chancellor, was of opinion that the agreement was void on both questions, both as in effect having been procured from a father under the duress of fear for his son and because:

"I do not think that a transaction of that sort would have been legal, even if, instead of being forced on the father, it had been proposed by him and adopted by the bankers." Now, is the agreement in question, "or is it not, one the object of which is to stifle a criminal prosecution? If there be any case in which that character can be properly given to an agreement, I think this is such a case, and therefore in my opinion the decree [below] is perfectly right."

Says Lord Westbury on the first question:

"The bankers admit, most clearly and distinctly, that they all knew it was a case of transportation for life. It is perfectly clear that they did not pre-

tend that the father was liable. What remained, then, as a motive for the father? The only motive to induce him to adopt the debt was the hope that by so doing he would relieve his son from the inevitable consequences of his crime. The question, therefore, my Lords, is whether a father, appealed to under such circumstances to take upon himself an amount of civil liability, with the knowledge that, unless he does so, his son will be exposed to a criminal prosecution, with the certainty of conviction, can be regarded as a free and voluntary agent. I have no hesitation in saying that no man is safe, or ought to be safe, who takes a security for the debt of a felon, from the father of the felon, under such circumstances. A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract that should be based upon the free and voluntary agency of the individual who enters into it. But it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether taken away from a father who is brought into the situation of either refusing, and leaving his son in that perilous condition, or of taking on himself the amount of that civil obligation. I have, therefore, my Lords, in that view of the case, no difficulty in saying that, as far as my opinion is concerned, the security given for the debt of the son by the father under such circumstances was not the security of a man who acted with that freedom and power of deliberation that must undoubtedly be considered as necessary to validate a transaction of such a description."

And on the second question:

"My Lords, there remains the other aspect of the case, which is this: Was the transaction, regarded independently of pressure, an illegal one, as being contrary to the settled rules and principles of law?"

And he proceeds, after stating the facts:

"Now, such being the nature of the transaction, my Lords, I apprehend the law to be this, and unquestionably it is a law dictated by the soundest considerations of policy and morality, that you shall not make a trade of a felony. If you are aware that a crime has been committed, you shall not convert that crime into a source of profit or benefit to yourself. But that is the position in which these bankers stood. They knew well, for they had before them the confessing criminal, that forgeries had been committed by the son, and they converted that fact into a source of benefit to themselves by getting the security of the father. Now, that is the principle of the law and the policy of the law, and it is dictated by the highest considerations. If men were permitted to trade upon the knowledge of a crime, and to convert their privity to that crime into an occasion of advantage, no doubt a great legal and a great moral offense would be committed. And that is what, I apprehend, the old rule of law intended to convey when it embodied the principle under words which have now somewhat passed into desuetude, namely, 'misprision of felony.' That was a case when a man, instead of performing his public duty, and giving information to the public authorities of a crime that he was aware of, concealed his knowledge, and rather converted it into a source of emolument to himself. It is impossible, therefore, if you look at this matter wholly independently of the question of pressure, and confine your attention to the act of the bankers alone, not to come to the conclusion that a great delictum was committed when the transaction is viewed simply with reference to the course which they took.

"I asked, in the first place, were you not well aware that these bills were forgeries? That is perfectly true. Did you not obtain an additional advantage and benefit—in fact, the payment of your debt—by trading with these bills? That is undoubtedly true. Were you not very well aware that, when you so traded with these bills, you would either prevent the possibility of a prosecution, or render the possibility of a prosecution so remote, that it could hardly be expected to succeed? That was the inevitable consequence. But if a man does an act which is attended necessarily with an inevitable conse-

quence, he must be taken in law to have foreseen that consequence, and, in point of fact, to have deliberately intended that it should be the result of his action. Here you have these bankers violating that rule of policy, and that rule of justice and morality, by using these forged bills to extort from the father a security which he was not liable for, they giving up the bills, and thereby violating their duty, and placing the parties in a situation in which the demands of public justice could not by any possibility be complied with. My Lords, I regard this as a transaction which must necessarily, for purposes of public utility, be stamped with invalidity, because it is one which undoubtedly, in the first place, is a departure from what ought to be the principles of fair dealing between man and man, and it is also one which, if such transactions existed to any considerable extent, would be found productive of great injury and mischief to the community. I think, therefore, that the decree which has been made in this case is a perfectly correct decree."

The principles of the decision in Williams v. Bayley were recognized and followed by the United States Circuit Court of Appeals for the Second Circuit, December 15, 1908, in the case of In re Lawrence, 166 Fed. 239, 92 C. C. A. 251, where it was held that, if it could be inferred from the circumstances of the case that there was an implied agreement not to prosecute, notes and securities given even in part for such considerations are void. The rule apparently deducible from the cases is that, where the creditor is paid or secured for his debt, or a part of it, being passive in the matter, and innocent of any representations to information or motives actuating the party making the payment or giving the security—in other words, receives the payment or security as made or given in due course by the debtor himself—the transaction is not, even as against the parties, necessarily void for illegality, although the undisclosed and unknown motive actuating the person enabling the debtor to make the payment or give the security was to shield the debtor from criminal prosecution. The distinction being between financial assistance rendered, on the one hand, by one from a feeling of affection or friendship, to save the party guilty from the exposure and shame of a criminal prosecution, but rendered without the knowledge and connivance of the creditor, and such assistance rendered, on the other hand, where the creditor has reasonable cause to know and believe it is procured for the purpose of stifling or preventing a criminal prosecution.

In the present case it is found as a conclusion of fact that the National Bank of Savannah, through its officers, under the circumstances of the case, was reasonably charged with the knowledge that the motive actuating the complainant in making the deed of conveyance to her son Harry W. All was to save her son John E. All from criminal prosecution, and it is further found as a conclusion of law that that deed of conveyance is, as against the defendants Harry W. All and the National Bank of Savannah, null and void.

[7] The next question is as to what relief should be granted. In a large class of cases it is held that in cases of an illegal consideration or executed contracts illegal therefrom the court will leave the parties as it finds them. Where the contract is executory, it will relieve against it, but, where it is executed, it will leave the parties as it finds them. In other words, it will neither relieve one party by canceling the deed of conveyance, nor relieve the other party by putting him in possession

of the property conveyed. This seems an unsatisfactory and illogical result in the present case, as, taking the contract as executed by the deed to Harry W. All, it leaves the matter open to another lawsuit. Mrs. All, being in possession of the property (if she is), would maintain her possession, and the bank would be put to its civil action to recover possession, and in the case, upon the production of this decree, the court in whose jurisdiction the action to recover may be brought would leave the parties as it finds them. The better rule would be to follow the action of the court in Williams v. Bayley, where the contract was canceled and the securities directed to be returned. Where, in the case of an executed contract, the rights of innocent third parties without notice had intervened, their rights would be protected by the court; but such is not the present case. The property is still held by the National Bank of Savannah.

It is accordingly ordered, adjudged, and decreed that the deed of conveyance from T. Gertrude All to Harry W. All of the premises described in the bill of complaint herein, bearing date the ———— day of August, 1910, and recorded in the office of the registrar of mesne conveyances for Barnwell county, Book 8D, page 238, as between the parties to these proceedings, is null and void, as being made for an illegal consideration, and that the defendant the National Bank of Savannah, by virtue of such deed and of the mortgage from Harry W. All of the property therein described made to the said National Bank of Savannah, and of the foreclosure sale by virtue of the foreclosure proceedings in this court for foreclosure of such mortgage, and the deed of conveyance from the master of this court thereof to the said National Bank of Savannah made in pursuance of the decree in said foreclosure proceedings, takes no interest whatsoever in the lands and premises described therein as against the plaintiff T. Gertrude All, who as against the National Bank of Savannah is entitled to the title to and the possession of said premises.

It is further ordered, adjudged, and decreed that within 30 days from the date of this decree the National Bank of Savannah do deliver to and file with the clerk of this court the said deed of conveyance from T. Gertrude All to Harry W. All, and the said mortgage from Harry W. All to the National Bank of Savannah, and the said deed of conveyance from the master of this court to the said National Bank of Savannah, and upon the delivery of the same to the clerk of this court that the clerk of this court shall execute in proper form a memorandum on each of them that the same has been canceled under and by virtue of this decree, and have his declaration therein to that effect duly probated in form to be recorded according to the laws of this state, and that, upon payment of the costs of these proceedings and the costs of probating, remitting, and recording the same, he do have the record of such statements of cancellation as so probated recorded in the office of the registrar of mesne conveyances for Barnwell county.

On consideration of all the circumstances of this case, however, it is further ordered, adjudged, and decreed that the complainant, under the circumstances of this case, should pay all the costs of these pro-

ceedings, and that judgment for the same may be entered against her upon default in payment thereof.

### On Petition for Rehearing.

Jas. A. Willis, of Barnwell, S. C., John W. Vincent, of Hampton, S. C., and Bates & Simms, of Barnwell, S. C., for plaintiff.

McCullough, Martin & Blythe, of Greenville, S. C., and Garrard & Gazan and E. S. Elliott, all of Savannah, Ga., for defendants.

This matter came on to be heard upon a petition for a rehearing, for the purpose of procuring a rescission or modification of the decree of this court filed herein on the 30th day of March, 1918. Due notice of the application has been given, and counsel on both sides have appeared and been heard.

[8] So far as the application is based upon the grounds set up in the petition, that the decree rendered in the case was not supported by the testimony, or is decidedly and strongly against the weight of the testimony, the court sees no reason to grant the rehearing. The first decree was made after a full and careful consideration of all the testimony, and in the opinion of the court there is no reason to change its conclusions of fact arrived at, based upon the testimony in the cause. The testimony in the case of the National Bank of Savannah against Harry W. All, for the foreclosure of the mortgage given by Harry W. All to the National Bank of Savannah, referred to and relied upon in the application for a rehearing, is not testimony in this case. The complainant, T. Gertrude All, was not a party to those proceedings. She did not have the opportunity to cross-examine any witnesses produced, and the evidence of the witnesses in that case is not evidence against her. The introduction in evidence of a judgment roll, as in the present case, as against a person not a party to the proceeding, is effective to establish the fact that such a judgment has been recovered. It is not effective to put in evidence the testimony in that cause. If it could be so effective, the result would be that a third party, not a party to the cause, might have the issues against him tried upon testimony given by witnesses whom he had never seen or had the opportunity of cross-examining. The statement of the proposition in itself is its refutation.

[9] Furthermore, the decree in the foreclosure case referred to was in effect a consent decree, and is a carefully guarded one. No judicial conclusions either of fact or law were found by the court. The decree, therefore, was practically nothing more than a contractual matter between the National Bank of Savannah and Harry W. All, whereby Mrs. T. Gertrude All was in no wise bound.

[10] Another point was raised at this hearing, however, which involves more consideration, viz., that the court erred in this matter because the contract between the parties had been executed, and, both parties being in pari delicto, the court would leave them as it found them. The question, in the first instance, is whether or not the contract in question was really an executed contract. There are a number of cases with some refinement of definition as to what are executed

and executory contracts, and some confusion also as to the meaning of the word "executed." In legal parlance, the word "executed," referring to a contract, means that the contract or instrument itself was signed, sealed, or in some way formally agreed to as its proper execution. When referring, however, to executed and executory contracts, the word "executed" does not mean executed with regard to the instrument expressing the contract, but executed in the sense of performance—that the contract has been actually performed by both sides. An executed contract, it follows, is a contract which has been so entirely performed by both parties that nothing remains to be done by either; that is, where a contract is a contract which is executed as a whole. Some contracts may be executed as to one party, and executory as to the other. Very few contracts are therefore in this sense executed contracts, except where the entire act or acts, of whatever nature, contemplated to be performed by either party to the contract, have been performed. A bond under seal, although it may covenant to pay a sum of money at a future date, is not in this sense an executed contract, as there is an act to be done by the obligor, to wit, the payment of the money. Nor is a deed of conveyance, solemn in form as it may be, an executed contract in this sense in itself—that is to say, in the sense of entire performance—because a deed of conveyance is only the evidence of the transfer of title and the right to possession. To execute it, in the sense of performance, there must be a delivery both of the deed and the land. The actual possession of the land must be delivered by the grantor to the grantee before the transfer is so executed.

In the case of Fletcher v. Peck, 6 Cranch, 87, 3 L. Ed. 162, the Supreme Court of the United States held that a grant from a state was an executed contract, and was equally within the prohibition of the constitutional provision forbidding the performance of the contract as an executory contract; but in giving that definition the Supreme Court was dealing with the question whether or not the constitutional inhibition applied only to executory contracts, and not executed contracts, and held that the prohibition applied equally to contracts which were claimed to be executed, such as a grant, as well as contracts which were still executory. In Farrington v. Tennessee, 95 U. S. 679, 24 L. Ed. 558, the court says:

"Contracts are executed or executory. A contract is executed, where everything that was to be done is done, and nothing remains to be done. A grant actually made is within this category. Such a contract requires no consideration to support it. * * * The constitutional prohibition applies alike to both executory and executed contracts, by whomsoever made."

The point of nonperformance, as taking from the contract the character of an executed one, was not claimed or discussed. A definition, and one the most frequently repeated, is that given in McDonald v. Hewett, 15 Johns. (N. Y.) 349, 8 Am. Dec. 241, where it is stated that an executory contract conveys a chose in action; an executed contract, a chose in possession. The term "chose in possession," however, is a little ambiguous, in the word "chose," because it may convey realty, and therefore it would be better to say an executed contract conveys

res, or property, into possession. The definition given in 1 Bouvier's Law Dictionary, 356, is that a contract becomes an executed one when nothing remains to be done by either party, and where the transaction has been completed, or was completed at the time the contract was made. A deed of bargain and sale of personal property, therefore, is not necessarily executed—that is, not performed—at the time that the contract is signed and sealed. It becomes executed only when the grantor has transferred the actual physical possession to the grantee. The same is the case with a deed of conveyance of real estate under the common-law method of feoffment, where delivery of possession by turf and twig was necessary. There was a written deed of feoffment or sale; then the parties actually went upon the land, and a formal delivery of possession by turf and twig was made by the grantor, a certificate of which delivery was appended by the witnesses to the deed. Until, however, this actual delivery of possession by turf and twig was performed, the contract was not performed or executed. So, when the method of conveyance by lease and release was adopted, the form of a lease was first used to put the party in possession, and, the party so being in physical possession of the land under the lease, the release was executed under the statute for transferring uses into possession, in the terms of an indenture, or release, conveyance, and sale, which transferred the title, so the transfer of title and the transfer of actual possession both concurred.

Applying these principles to the present case, it is evident that the contract was not an executed one by performance, inasmuch as no actual possession transferring the land in question to the National Bank of Savannah has ever been made. The evidence is that Mrs. T. Gertrude All, the complainant, has never parted with the possession of the property; not when she made the deed of conveyance to her son Harry W. All, nor did the latter deliver possession to the National Bank of Savannah. That this is the case appears from the petition for a writ of assistance, which was filed by the National Bank of Savannah in the case of National Bank of Savannah v. Harry W. All, in the foreclosure proceedings before alluded to, filed on the 22d of December, 1917, whereby the National Bank of Savannah prayed for a writ of assistance, directing the marshal of the district to put the National Bank of Savannah in possession of the land, demand for possession of which had been made upon Harry W. All, and which, from the affidavits submitted with the petition for the writ, it appears All refused to deliver, stating that he had never been in possession of the land. The record in the foreclosure case, therefore, upon the application of the National Bank of Savannah itself, shows that the National Bank of Savannah has never been in possession of the property, and the deed of conveyance to Harry W. All by the complainant, T. Gertrude All, and by the master of this court in the foreclosure case, acting under the contractual decree for sale, to the National Bank of Savannah, have never been executed or performed by any delivery of possession.

It was argued that the mere execution of a deed is a complete execution or performance of the contract, because in an action of eject-

ment, or for recovery of possession of real estate, the production of a deed is sufficient evidence of the right to possession. Even were this true as against the parties to that deed, or against parties to the foreclosure proceedings, it would not be true as against outside parties, such as the complainant, T. Gertrude All, in this case. Furthermore, in an action for ejectment, the production of the deed transferring the title would appear to be only presumptive of the performance by the delivery of the possession. It would still be competent for the contestant to prove, either that the deed itself had not been fully executed, in that the deed itself had not been delivered, or that the contract had never been fully executed, in that possession of the land had never been delivered, for whatever that might be worth, as against any executory right of possession created by the delivery of the deed. It would not appear, therefore, that there is any such executed contract in this case, as would be necessary to lead the court to apply the doctrine that, where both parties are in pari delicto in the case of an invalid contract of holding, the National Bank of Savannah is entitled to the possession of the property.

Apart from this, it would not appear that that principle of law should apply in a case such as this, where the deed is declared invalid, upon the grounds of public policy. It may well be that the complainant, T. Gertrude All, does not appear in a very admirable position. She was, in the opinion of the court, beyond doubt stimulated in her action by her desire to protect her son from criminal prosecution and punishment. She acted under the pressure of her maternal feelings for the safeguarding of her offspring. All that has been accomplished. The period within which her son could be prosecuted criminally under the statutes of Georgia has expired, and all criminal prosecution against him is now barred. Whilst the element of criminal prosecution is not a right which belonged to the National Bank of Savannah, which it could rely upon as thereby losing something which has prejudiced it in its position in this suit, yet the fact still is that, the immunity from prosecution having been secured, the result is that Mrs. Gertrude All is now attempting to set aside and treat as nought the promises under which, according to her own statement, that immunity was procured.

That, however, is not the question. The contract is not set aside because of any legal or equitable rights belonging to Mrs. T. Gertrude All, the complainant. It is set aside on the grounds of public policy, in view of the potentiality for great evil that would result from allowing such contracts to be upheld. The theory of the law is that such a strong lever as parental—especially maternal—affection shall not be used to compel persons affected to strip themselves for the benefit of a criminal and unworthy son or relation. Nor shall it be so that, where a person has committed a crime, those who should be the prosecuting witnesses to bring him to justice shall be stimulated to nonaction or induced to stifle prosecution for any financial gain. Where a person injured may not set the criminal machinery of the law in action out of humanity or tender consideration for a weak or youthful criminal, it may be one thing; but where the machinery of the law and the administration of public justice is not set in action by those who

should do so because of some financial benefit to inure to the party who should be the prosecuting witness, it is another thing; and it is not the result which the law desires to allow consummated. The contract in this case is declared invalid on grounds of the highest public policy.

For all these reasons, the opinion of the court is that its conclusions in the former decree should not be disturbed, and the application for a rehearing is therefore refused.